**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**No. 88 CIV. 4486 (DNE).**

United States District Court,
S.D. New York.

Jan. 17, 1990.

Otto G. Obermaier, U.S. Atty., S.D. N.Y., Edward T. Ferguson, III, Richard Mark, Peter Sprung, Allan N. Taffet, Steven C. Bennett, Asst. U.S. Attys., Randy M. Mastro, Sp. Asst. U.S. Atty., of counsel, for U.S.

Anderson, Kill, Olick & Oshinsky, New York City, Eugene Anderson, Jordan

Stanzler, Tracy Makow, of counsel, for Daniel Ligurotis, Teamster Local 282.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y., William M. Feigenbaum, Richard P. Weisbeck, of counsel, for Harold Friedman, Teamsters Union Local Nos. 264, 375.

Berkman, Gordon, Murray & Palda, Cleveland, Ohio, J. Michael Murray, Ann N. Butenhoff, of counsel, for Warehouse, Manufacturing Processing, Assembling and Installer Employees, Teamster Local No. 507.

Wohlner Kaplon Phillips Vogel Shelley & Young, Encino, Cal., Robert D. Vogel, of counsel, for Teamsters Union Local Nos. 63, 87, 166, 186, 208, 389, 399, 495, 598, 630, 692, 848, 896 and 911.

Joseph E. Girouz, Jr., Buffalo, N.Y., of counsel, for Truckdrivers Local 449, Joint Council 46 and Teamsters Union Local No. 649.

Friedman & Levy-Warren, New York City, Jay P. Levy-Warren, of counsel, for Teamsters Union Local No. 707.

Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A., Cleveland, Ohio, John R. Climaco, Paul S. Lefkowitz, Jack D. Maistros, Thomas M. Wilson, of counsel, for Teamsters Union Local Nos. 473, 436, 348, 422, 293 and 348.

Grady & Dwyer, Boston, Mass., Gerard F. Daley, of counsel, for Joint Council 10 and Teamsters Union Local Nos. 1, 25, 42, 49, 55, 59, 64, 82, 122, 127, 157, 170, 259, 340, 379, 380, 404, 437, 494, 504, 526, 597, 633, 653, 686, 829 and 841.

Slotnick & Baker, New York City, Barry Ivan Slotnick, Louis H. Benjamin, Robert L. Tucker, Lori Mann, of counsel, for Teamsters Union Local Nos. 813 and 1034.

Spivak, Lipton, Watanabe & Spival, New York City, Franklin K. Moss, of counsel, for Joint Councils 43 and 65, and Teamsters Union Local Nos. 550, 7, 51, 124, 164, 214, 247, 283, 299, 328, 332, 337, 339, 372, 406, 486, 580, 614, 1038, 1620 and 2040.

Beeson, Tayer, Silbert, Bodine & Livingston, San Francisco, Cal., Duane B. Beeson, of counsel, for Joint Councils 7, and 38, and

Teamster Union Local Nos. 15, 70, 78, 85, 87, 94, 137, 150, 216, 226, 228, 278, 287, 291, 296, 302, 315, 350, 386, 431, 432, 439, 484, 490, 517, 533, 576, 588, 601, 616, 624, 665, 679, 746, 748, 849, 853, 857, 860, 890, 896, 912 and 921.

Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City, Sidney Fox, of counsel, for Teamsters Union Local No. 202.

Patrick J. Calihan, Chicago, Ill., of counsel, for Local Teamsters Union No. 727.

Asher, Gittler & Greenfield, Ltd., Chicago, Ill., Marvin Gittler, Steven J. Feinberg, of counsel, for Teamsters Union Local Nos. 142, 703, 706, 710, 712, 738, 743, 744 and 754.

Markowitz & Richman, Philadelphia, Pa., Richard H. Markowitz, of counsel, for Joint Council No. 53, its Affiliated Local Unions, Pennsylvania Conference of Teamsters, and Teamsters Union Local No. 35.

Fisher & Fisher, Brooklyn, N.Y., Andrew S. Fisher, of counsel, for Teamsters Union Local 237, Sidney L. Meyer, of counsel, for Teamsters Union Local No. 810.

Cozza & Steuer, Cleveland, Ohio, Arlene B. Steuer, John T. Price, of counsel, for Teamsters Union Local 73.

David Leo Uelmen, Milwaukee, Wis., of counsel, for Joint Council 39 and Teamsters Union Local Nos. 23, 43, 75, 200, 344, 662, 579, 695, 563 and 1081.

Carney, Buckley, Kasameyer & Hays, Portland, Or., Richard R. Carney, of counsel, for Joint Council 37 and Teamsters Union Local Nos. 57, 58, 81, 162, 206, 223, 281, 305, 324 and 962.

Iannuzzi & Iannuzzi, New York City, Dominick J. Porto, of counsel, for Teamsters Union Local No. 27.

Sipser, Weinstock, Harper & Dorn, New York City, of counsel, for Joint Council No. 64, Soft Drink Workers Union, Local No. 812.

Baptiste & Wilder, Washington, D.C., Robert M. Baptiste, Roland P. Wilder, Jr., Carey R. Butsavage, of counsel, for Joint Council 16, Joint Council 18 and Teamsters Union Local Nos. 182, 858, 687 and 72.

Manning, Raab, Dealy & Sturm, New York City, Ira A. Sturm, of counsel, for Teamsters Local Union No. 210.

Beins, Axelrod, Osborne & Mooney, Washington, D.C., Hugh J. Beins, Jonathan G. Axelrod, John R. Mooney, of counsel for Joint Council Nos. 9 and 55, and Teamsters Union Local Nos. 28, 61, 71, 86, 391, 33, 67, 246, 639, 730, 922, 1714 and 509.

Sweeney, Gallo & Reich, Sunnyside, N.Y., Gerard J. Sweeney, of counsel, for Teamsters Union Local 803.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, Michael B. Standard, of counsel, for Teamsters Union Local 840.

Immerman & Perlman, New York City, Stanley A. Immerman, of counsel, for Teamsters Union Local 854.

Richard M. Greenspan, White Plains, N.Y., of counsel, for Teamsters Union Local No. 522.

Richard A. Weinmann, New York City, of counsel, for Teamsters Union Local 102.

Ira Drogin, New York City, of counsel, for Teamsters Union Local 295.

Newman & Schwartz, New York City, Gustave H. Newman, Richard A. Greenberg, Deborah A. Schwartz, William Shields, of counsel, for Teamsters Union Local 945.

Norman Zolot, Woodbridge, Conn., for Teamsters Union Local 191, 443, 493, 677, 1035 and 1150.

Roberts, Carroll, Feldstein & Tucker, Providence, R.I., Richard Peirce, of counsel, for Teamsters Union Local 251.

Schnieder, Cohen, Solomon, Leder & Montalbano, Cranford, N.J., Zachary Schnieder, David Grossman, of counsel, for Teamsters Union Local Nos. 11, 153, 418, 462, 680, 560, 617 and 701.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the United States of America (the "Government") against the defendants Internation-

al Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in a consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials, an Independent Administrator to oversee the remedial provisions, an Investigations Officer to bring charges against corrupt IBT officials, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

These rulings arise in response to three separate motions by the Government asking this Court to issue extraordinary writs by its powers under the All Writs Act, 28 U.S.C. § 1651, to enjoin collateral suits filed by IBT members, locals, joint councils, and area conferences (the "subordinate entities")—in sister United States District Courts in other judicial districts—which attempt to litigate matters relating to the Consent Decree. These actions, arising in Chicago, Illinois, Cleveland, Ohio, and Newark, New Jersey, (together, the "collateral lawsuits") involve actions which either seek relief from rulings issued by this Court in relation to the implementation of the Consent Decree or a delineation of a subordinate entity's rights under the Consent Decree.

The Government, in sum, seeks to have this Court enjoin all lawsuits which seek to litigate issues arising under the Consent Decree filed in any forum other than the Southern District of New York. This request would serve the purpose of channeling all such litigation to this forum. The Government also asks this Court to compel the withdrawal of pending collateral lawsuits. The Government further seeks a definitive determination from this Court

binding all subordinate entities to the Consent Decree.

This Court has entered and extended a temporary restraining order pursuant to the All Writs Act and Rule 65(b) enjoining any subordinate entity from prosecuting any existing collateral lawsuit or filing any new collateral suit which seeks to adjudicate matters relating to the Consent Decree in any district other than before this Court. This Court has received submissions from almost half of the 700 subordinate entities opposing this injunction and vehemently denying that they are bound by the Consent Decree. Since this injunction is necessary "in aid of" this Court's jurisdiction over a nationwide litigation with unique circumstances, the Government's request for a permanent injunction is granted.

## I. The Current Litigation

Since taking effect the Consent Decree has engendered a flow of dispute and discord between the Government, the IBT, and the Court Officers appointed to the positions the Consent Decree created. Despite the constant undercurrent of displeasure with the Consent Decree by the IBT, the recent actions by subordinate entities seeking independent adjudication of related matters have created an eruption of litigation unprecedented even by the warped standards practiced by the IBT in this case.

### A. The Chicago, Cleveland, and New Jersey Suits

The first suit filed was on November 17, 1989 in the United States District Court for the Northern District of Illinois (the "Chicago suit") captioned *Chauffeurs, Teamsters & Helpers et al. v. Michael H. Holland, Election Officer,* No. 89 Civ. 8577 (N.D.Ill.) by a number of Chicago, Illinois area IBT Locals and their officers, (the "Chicago plaintiffs").[2] On November 21, 1989, the Government presented and this Court signed an order requiring the Chica-

---

**2.** The full roster of plaintiffs in the Chicago Suit includes the following IBT locals and Individuals; IBT Local 301 and its president, Robert Barnes; IBT Local 705, its Secretary–Treasurer Daniel C. Ligurotis and its President Donald

Heim; IBT Local 726 and is Secretary–Treasurer C.S. Spranzo; IBT Local 734 and its President Robert N. Meidel; and IBT Local 781 and its President Joseph Bernstein.

go plaintiffs to appear before this Court at a hearing held November 27, 1989 and show cause why (1) an injunction should not be entered by this Court enjoining the Chicago plaintiffs from prosecuting the Chicago suit, and (2) Chicago plaintiff Daniel Ligurotis, a signatory to the Consent Decree, should not be adjudged in contempt of the permanent injunction at ¶ E.10 of the Consent Decree for obstructing and interfering with the work of the Election Officer (the "Chicago order to show cause").

In sum, the Chicago suit alleges that the actions Election Officer Michael Holland intends to take with regard to supervising the IBT's 1991 election and the initial local elections for delegates to the 1991 Convention have overstepped bounds set by the IBT Constitution. This overall allegation is buttressed by claims that provisions in ¶ F.12(D) of the Consent Decree impermissibly amend the IBT Constitution. The Chicago plaintiffs further charge that the Memorandum and Order of this Court dated October 18, 1989 (the "October 18, 1989 Opinion") contravenes the IBT Constitution.

The real gist of the Chicago plaintiffs' allegations is that the Consent Decree and its interpretation in this Court's October 18, 1989 Opinion granted both the International IBT and the GEB too much power to alter the IBT Constitution, and upset the delicate federalism that governs relations between the International IBT and its hundreds of subordinate entities. The Chicago plaintiffs, save Daniel Ligurotis, were uninvolved in the original suit and, they claim, neither explicit signatories nor implicit assentors to the Consent Decree. The Chicago plaintiffs sought a declaratory judgment immunizing themselves from submitting to the strictures of the Consent Decree, namely electoral reform resulting in democratic secret ballot elections.

The Chicago order to show cause required all parties to the Chicago suit to appear at a hearing on November 27, 1989. On November 27, 1989, Counsel for Ligurotis appeared, and the other plaintiffs in the Chicago suit defaulted. On November 27,

1989, this Court issued a preliminary injunction pursuant to its inherent power under the All Writs Act enjoining all of the plaintiffs in the Chicago suit from taking any further actions in connection with that suit except filing a notice of voluntary dismissal pursuant to Rule 41(a)(1)(i) of the Federal Rules of Civil Procedure or responding to motions made by the defendant in the Chicago suit. On November 29, 1989, the Chicago plaintiffs filed an amended complaint which dropped Consent Decree signatory Daniel Ligurotis as a plaintiff, and withdrew counts with connections to the Southern District of New York.

On December 8, 1989, this Court held a factual hearing on the contempt portion of the Chicago order to show cause. At that hearing, Chicago plaintiff Daniel Ligurotis was required to refute testamentary and affidavit evidence offered by the Government as to why his involvement as a Chicago plaintiff would not constitute civil contempt in violation of the permanent injunction located at ¶ E.10 of the Consent Decree against interference with the work of the Court Officers.

In a Memorandum & Opinion dated December 12, 1989 (the "December 12, 1989 Opinion"), this Court deemed Daniel Ligurotis in civil contempt, and further found Ligurotis had the ability to cause the withdrawal of the Chicago suit by virtue of his leadership positions in the IBT and uncontroverted testimony. 726 F.Supp. 943, 948–50. This Court then sanctioned Ligurotis (1) for the reasonable costs that the Government and Court Officers incurred responding to the Chicago suit, and (2) an amount set at $125 on Friday, December 15, 1989, and doubling daily until the withdrawal of the entire Chicago suit with prejudice, but not to exceed $512,000. Ligurotis subsequently appealed the contempt finding and penalty to the Court of Appeals, which stayed the penalties and granted an expedited appeal.

The second action really encompassed two separate happenings in Cleveland, Ohio (together, the "Cleveland actions"). The first of these involved a new suit filed by IBT Local 507 of Cleveland Ohio, on De-

cember 1, 1989, 89 Civ. 2338, captioned *Warehouse, Manufacturing, Processing, Assembling & Installer Employees Local 507 v. International Brotherhood of Teamsters, et al.*, before Judge Aldrich of the Northern District of Ohio (the "Cleveland suit"). The Cleveland suit named as defendants the Independent Administrator, the Investigations Officer, and the International headquarters and leadership of the IBT (the "International IBT") and asks for declaratory and injunctive relief to halt what Local 507 alleged were breaches of the IBT Constitution, its contract with the International IBT.

The second action involved Local 507 President and Consent Decree Signee Harold Friedman. Friedman filed a motion before the Judge White of the Northern District of Ohio—who sentenced Friedman in his criminal conviction in *United States v. Friedman*, 86 Cr. 114 (N.D.Oh.)—for an order preventing the Independent Administrator from hearing charges against Friedman (the "Cleveland motion"). Friedman presented the motion as an order to show cause why a temporary restraining order should not be issued obligating the Court Officers to abide by the stay of his sentence issued by Judge White while his appeal to the United States Court of Appeals for the Sixth Circuit pends.

On December 6, 1989, the Government presented this Court with an order directing Local 507 and Friedman to show cause why an order should not be entered (1) preventing any further action in the Cleveland suit and the Cleveland motion, and (2) holding Friedman in contempt of court (the "Cleveland order to show cause"). In addition, a temporary restraining order was sought enjoining Local 507 from taking any further action in the Cleveland suit, and preventing Friedman from taking any further action in connection with the Cleveland motion. At 4:15 p.m. on December 6, 1989, while considering the Cleveland order to show cause, this Court was informed that Local 507 had submitted its own motion for a temporary restraining order to Judge Aldrich in Cleveland. Upon this Court's signing of the Cleveland order to show cause and temporary restraining order,

Judge Aldrich returned Local 507's order unsigned. On December 7, 1989, this Court issued a further order commanding Friedman to withdraw the Cleveland motion.

Summarily, the Cleveland actions sought relief for the President of Local 507, Harold Friedman, and its recording secretary, Anthony Hughes ("Friedman and Hughes") from facing charges filed by the Investigations Officer that would remove them from their positions as leaders of Local 507. The Cleveland suit charged that the Consent Decree and its subsequent interpretations that allow the Court Officers to pursue removal of Friedman and Hughes represented a breach of the contract between Local 507 and the International IBT, namely the IBT Constitution. The Cleveland motion more obviously sought to expand the stay issued in the criminal case and prevent any action which might result in Friedman's removal.

A hearing was held on Friday, December 8, 1989, to determine whether the temporary restraining order entered on December 6, 1989 should be continued as a preliminary injunction. Both Local 507 and Friedman appeared at the December 8, 1989 hearing to object to entering further injunctions. After listening to argument from Local 507, Friedman, and the Government, this Court let stand the temporary restraining orders in place pending the submission of further papers. Local 507 and Friedman were to submit memoranda by Monday, December 11, 1989, and the Government response papers by Wednesday, December 13, 1989. A further hearing on the temporary restraining orders and a factual hearing on the alleged contumacious conduct of Friedman was to be held on Friday, December 15, 1989. After the December 11, 1989 hearing, Friedman withdrew his motion before the Judge White.

At the factual portion of the December 15, 1989 hearing, the Government presented documentary evidence and the testimony of Harold Friedman to support its contention that Mr. Friedman was in contempt, and had the power to cause the withdrawal

of the Cleveland suit and motion. The December 15, 1989 hearing was adjourned until December 20, 1989 in order that Friedman and Local 507 would produce records that might support the Government's contentions.

On December 20, 1989, the contempt hearing resumed with Friedman again testifying as to his role in the Cleveland suit, the remaining Cleveland action. After lengthy and emotional testimony by Friedman about his leadership positions in the Ohio subdivisions of the IBT and his role in the filing of the Cleveland actions, this Court granted Friedman a one-week period to cause the withdrawal of the Cleveland suit, and to comply with the Government's request to produce additional records of Local 507. On December 22, 1989 this Court was notified that the Cleveland suit had been withdrawn and presented with copies of the dismissal without prejudice. The Government withdrew its discovery requests.

The third suit filed was brought on December 8, 1989 by Joint Council 73 [3] and Local 641 before Judge Ackerman in the District of New Jersey (the "New Jersey suit"). Styled *Joint Council 73 et al. v. International Brotherhood of Teamsters and Charles Carberry, Investigations Officer*, 89 Civ. 5094 (D.N.J.), the New Jersey suit challenges the authority of Investigations Officer Carberry to examine the books and records of Joint Council 73 and Local 641.[4] The plaintiffs ask the New Jersey court to declare invalid ¶ 12(C)(i)(a) of the Consent Decree, which authorizes the Investigations Officer to examine the books and records of IBT subordinate entities.

Three other IBT locals which also received the same production request informed the Investigations Officer that for the moment they would voluntarily comply with the examination request, but reserved the right to object to these requests at a future time. Two of the Locals, 617 and 863, are located in New Jersey and members of Joint Council 73. The remaining objector, Local 283, has members from Detroit, Michigan and vicinity and is part of Joint Council 43, which encompasses Michigan Locals.

In response to the three active collateral suits and the threatened legal action from three other subordinate IBT entities, the Government asked this Court to issue an injunction nationwide in scope banning all collateral lawsuits and ordering that all such actions be brought before this Court.

### B. The Nationwide Order to Show Cause

On December 15, 1989, the Government presented and this Court signed an order requiring all subordinate IBT entities— over 700 in number—to show cause why an injunction should not be entered under the power conferred upon this Court by the All Writs Act preventing them from filing any suit seeking to adjudicate matters relating to the Consent Decree anywhere except before this Court (the "nationwide order to show cause"). The Government also requested, and this Court entered a temporary restraining order pursuant to the All Writs Act and Rule 65(b) of the Federal Rules of Civil Procedure preventing the IBT or any subordinate entity from initiating or prosecuting lawsuits which raise issues relating to the implementation of the Consent Decree (the "nationwide TRO"). The overall purpose of these actions (collectively, the "nationwide injunction") was to preserve the status quo pending full consideration of the propriety of collateral lawsuits in other jurisdictions arising under the Consent Decree.[5]

---

**3.** Joint Council 73 is the intermediate IBT entity which encompasses Locals from the northern New Jersey area. Local 641 is a member of Joint Council 73.

**4.** Investigations Officer Carberry sent letters dated December 4, 1989 to a number of Locals affiliated with Joint Council 73 seeking to examine personnel files, contracts, leases, member-

ship records, correspondence, letters, memoranda, calendars, diaries, and rolodex and other records of "frequently used" telephone numbers from a three year period. The New Jersey suit was filed on December 8, 1989.

**5.** The full language of the nationwide TRO as signed by this Court reads as follows:

The nationwide order to show cause served over 700 locals, joint conferences, and area conferences by overnight mail and determined that receipt of the Government's moving papers by 5:00 p.m. on December 19, 1989 by a subordinate entity constituted valid service. The order further required subordinate entities to submit papers by 5:00 p.m. on December 26, 1989. The Government would submit response papers by 5:00 p.m. on December 29, 1989. The matter would be deemed fully submitted on January 2, 1990, when the ten-day nationwide TRO would expire.

A tremendous number of the IBT subordinate entities responded to the nationwide order to show cause and filed papers on December 26. This court received over 70 briefs from subordinate entities representing at least 282 out of the 651 Locals, 20 of the 44 Joint Councils, and two state conferences. Upon request of the Government this Court found good cause to extend the nationwide TRO an additional ten day period because of this overwhelming response, and on January 2, 1990 entered an order continuing the nationwide TRO until January 17, 1990.

## II. The Autumn of Discontent

These latest installments in the ongoing saga to implement the Consent Decree trace their roots to the conflict between the IBT and Government and the Court Officers over the Consent Decree. These disputes generally involve contentions over the scope of the duties of the Court Officers, or to what extent Consent Decree

"ORDERED that in order to preserve the status quo pending the Court's decision on the Government's motion, and pursuant to the All Writs Act, 28 U.S.C. § 1651, and Rule 65(c) of the Federal Rules of Civil Procedure, the plaintiffs in the aforesaid New Jersey lawsuit, as well as all other local unions, joint councils, area conferences, and other entities affiliated with the IBT are hereby temporarily restrained and enjoined from filing or taking any legal action that challenges, impedes, seeks review of or relief from, or seeks to prevent or delay any act of any of the court officers appointed by this Court pursuant to the Consent Order in this action, in any court or forum in any jurisdiction except this Court;"

binds the myriad parts of the vast organizational structure that is the IBT.

The first major dispute related to the duties of the Election Officer, Michael Holland. This issue was raised in Application II, which the Independent Administrator filed with this Court on September 29, 1989. This disagreement over the interpretation of ¶ 12(D) of the Consent Decree resulted in a hearing on October 13, 1989 and was settled by the October 18, 1989 Memorandum and Order of this Court, 723 F.Supp. 203 (S.D.N.Y.1989) (Edelstein, J.).[6] The discord centered around the interpretations of the word "supervise" and the phrase "1991 election."

At the October 13 hearing, the IBT advocated narrow interpretations of ¶ 12(D), arguing first that the phrase "1991 election" limited the Election Officer's duties only to the ballots for International Officers at the 1991 IBT Convention, and not the nominating process involving local IBT elections unless sought. Further, the IBT asked that "supervise" be interpreted to limit the Election Officer to an observer status with no authority to intrude on elections of the locals. The Government and the Court Officers offered an interpretation of ¶ 12(D) which envisioned the Election Officer involved in all phases of the 1991 election, and saw "supervise" as empowering the Election Officer to take an affirmative and proactive role in all facets of the 1991 election, including the local elections to elect delegates to the 1991 IBT Convention.

The October 18, 1989 Opinion of this Court endorsed the affirmative and active

Nationwide TRO, entered December 15, 1989.

6. The full text of the relevant portion of ¶ 12(D) reads as follows:

"The Election Officer shall supervise the IBT election described above to be conducted in 1991 and any special IBT elections that occur prior to the IBT elections to be conducted in 1991. In advance of each election, the Election Officer shall have the right to distribute materials about the election to the IBT membership. The Election officer shall supervise the balloting process and certify the election results for each of these elections as promptly as possible after the balloting."

Consent Decree, paragraph F.12(D)(ix) at 15–16.

interpretations of ¶ 12(D) of the Consent Decree, finding that the parties intended expansive meanings for both "supervise"[7] and "1991 election."[8] Taken together, these interpretations empower the Election Officer to make meaningful reforms to the IBT electoral process.[9]

This interpretation of ¶ 12(D) has been vigorously opposed by the IBT. On October 27, 1989, the IBT moved this Court seeking (1) certification of the questions decided in the October 18, 1989 Opinion, and (2) a stay of those rulings pending appeal. On November 6, 1989, this Court issued an Order (the "November 6, 1989 Order") denying the IBT's motion for certification of these questions and refused to stay that decision. The IBT appealed to the Court of Appeals for the Second Circuit, where argument was held on December 12, 1989. On December 13, 1989 the Second Circuit dismissed the IBT's motions for appeals, granting the Government's motions to dismiss the IBT's appeals.

A further matter was raised at the October 13, 1989 hearing, where Friedman and Hughes jointly and separately moved this Court to prevent the Independent Administrator from hearing charges filed against them by the Investigations Officer. On October 16, 1989, this Court held a hearing on this injunction (the "October 16, 1989 hearing").

Friedman and Hughes argued, among other things, the unfairness of the Investigations Officer filing charges against them for conduct which formed the basis for their criminal convictions on labor racketeering charges in the case of *United States v. Friedman, et al.* in the Northern District of Ohio. Friedman and Hughes maintained that they could not be prosecuted because the IBT Constitution barred bringing charges for conduct that happened prior to their current elective term if it was "known generally" to the membership. Further, Hughes claimed, that since he was neither a party to the original suit nor a signatory of the Consent Decree, he was not bound by its changes to the IBT Constitution or any other of its provisions.

This Court found that the Independent Administrator could proceed with hearing the charges brought by the Investigations Officer. In a Memorandum & Order dated November 2, 1989 (the "November 2, 1989 Opinion"), this Court distinguished between allegations and conduct "known generally" to the membership. The November 2, 1989 Opinion further found that Hughes, even as a non-signatory to the Consent Decree was bound by it. The litigation posture of the IBT—whose whole purpose is to represent and protect its members—was to doggedly protect its members interests both during the active suit and in implementing the Consent Decree, and all parties intended that all IBT International Officer, Locals, and rank and file be bound by the Consent Decree. Friedman and Hughes subsequently appealed the November 2 Opinion to the Court of Appeals for the Second Circuit. The Second Circuit pre-

---

**7.** The October 18 Opinion held as follows:
"... I find that the specific language of paragraph 12(D) [of the Consent Decree], taken together with the spirit and intent of the Consent Decree, requires that the term 'supervise' be interpreted in its most expansive and proactive meaning."
723 F.Supp. at 206.

**8.** The October 18 Opinion held:
"I find that the term '1991 election' as written in paragraph 12(D) [of the Consent Decree] was intended to encompass the entire electoral process which will culminate in the 1991 election for International Officers. The parties to the Consent Decree intended for the Election Officer to oversee every prelude leading up to and including the final election for International Officers."

723 F.Supp. at 207.

**9.** The October 18 Opinion determined the Elections Officers specific duties to include:
"... the right to promulgate electoral rules and procedures for the IBT nomination and election, to conduct an educational program aimed at the IBT membership, to actively supervise, direct, and oversee the campaigning of candidates, to institute absentee voting procedures, and certify all elections.

. . . . .

... it is within the scope of the duties of the Election Officer to take any further reasonable actions necessary to carry out his duties as the Election Officer and ensure fair elections for the IBT membership."
723 F.Supp. at 207.

served their right to appeal the outcomes of their hearings.[10]

Relations between the Court Officers and the IBT began in a spirit of hoped-for cooperation and unity of purpose, but as the months passed these interactions became increasingly bitter. The first disputes centered around disputes over office space and funding that the IBT would provide to the Court Officers. Simmering tensions flared up in a series of events which followed the machinations involving Friedman and Hughes.

On November 1, 1989 the Independent Administrator filed Application V, where he charged that the IBT failed to notify him of two meetings of the GEB, occurring October 16–18 at Grenelefe, Florida, and a special meeting on November 1, 1989 in Washington, D.C., as required under ¶¶ F.12(C)(b) and F.12(C)(e)(iii) of the Consent Decree, and asked they be sanctioned. At a hearing held on November 13, 1989, the IBT replied they believed the Independent Administrator had constructive knowledge of the October 16–18 regular quarterly meeting, and that the November 1 special meeting involved privileged communications discussing litigation strategy for this case.[11] At that hearing, the Independent Administrator informed the IBT he wished to receive agendas for all GEB meetings in 1990.

In an Order of this Court dated November 16, 1989 (the "November 16, 1989 Order") the IBT was asked to submit further memoranda and affidavits on November 20, 1989 for *in-camera* review in order to evaluate their privilege claim. At a further hearing held on November 22, 1989, this Court redirected the IBT to resubmit a properly prepared and more detailed affidavit and to disclose their memorandum in support of privilege. On November 28, 1989, I received the further submissions from the IBT whose sufficiency was also a matter considered at the December 6, 1989 hearing. At that hearing, the IBT was directed to submit further, more detailed papers on this matter.

On November 3, 1989, I received Application VI from the Independent Administrator, which asked this Court to review the decision of the IBT to alter the publication schedule of the *International Teamster* magazine from monthly to quarterly, which was also considered at the November 13, 1989 hearing as contravening the spirit of ¶ F.12(E) of the Consent Decree. In the November 16, 1989 Order, this Court interpreted ¶ F.12(E) as assuming that the Independent Administrator would have monthly communications with the IBT membership, and that he should have monthly communications by mail if the magazine's publication were interrupted. Further, this Court ordered that the IBT make all rulings of this Court available to the rank and file, either in the *International Teamster*, or by direct mail.

Against this background of discord and discontent come the collateral lawsuits in Chicago, Cleveland and New Jersey culminating in the nationwide injunction. This Court has entered injunctions pursuant to the authority vested in this Court by the extraordinary power under the All Writs Act. Despite the voluminous submissions and extraordinary methods employed to confront the situation that had developed over the last two months, the real gist of the issues before this Court is quite simple. The subordinate entities oppose the provisions of the Consent Decree, and through

10. Friedman and Hughes both applied to this Court for stays of the rulings in the November 2, 1989 Opinion. Their motions to stay were denied by this Court. On December 12, 1989, the Court of Appeals for the Second Circuit granted Friedman and Hughes expedited appeals of the November 2, 1989 Opinion, but denied them a stay of the Independent Administrator's hearing pending the outcome of their appeals of their criminal convictions to the Court of Appeals for the Sixth Circuit. The Independent Administrator subsequently held

the disciplinary hearings, and on January 12, 1990, presented this Court with Application VII. Application VII decides the prosecutions against Friedman and Hughes.

11. The subject matter of the November 1 special meeting itself may become the subject of further litigation. At that meeting, the GEB reinterpreted the provisions in the IBT Constitution under which the Investigations Officer brought charges against Friedman and Hughes.

these collateral lawsuits, seek to escape its provisions, or its interpretations by this Court. The Government wishes to bind all the subordinate entities to the reforms embodied in the Consent Decree, and to repulse what it believes are dispersed attacks designed to undermine the viability of the Consent Decree.

### III. Authority to Issue the Injunctions

In the orders to show cause, the Government asked this Court to issue injunctions requiring that all suits pertaining to the Consent Decree be filed before this Court. These injunctions also enjoin plaintiffs from prosecuting or instituting suits in sister federal tribunals. A review of the relevant law reveals that this Court has the authority to take this action.

#### A. The All Writs Act

The Government submitted that this Court has the power to issue extraordinary writs under the All Writs Act. That statute reads as follows:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651(a).

The broad language of the All Writs Act has been supplemented by case law which outlines the appropriate situations for issuing injunctions that bar parties from litigating suits before other tribunals. In this Circuit, Courts interpreting the scope of this power under the All Writs Act look to that act, and also by analogy to circumstances involving the Anti–Injunction Act, 28 U.S.C. § 2283, which prevents Federal Courts from issuing injunctions barring proceedings in state tribunals except "when necessary in aid of jurisdiction." *In re Baldwin–United Corporation,* 770 F.2d 328, 335 (2d Cir.1985).

Circumstances where inter-court injunctions under the All Writs Act are appropriate include (1) enjoining state actions when necessary to prevent relitigation of an existing federal judgment; *Id., see*

*United States v. New York Telephone,* 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977); (2) preventing a state court from interfering with a federal court's consideration or disposition of a case so "as to seriously impair the federal court's flexibility and authority to decide that case" *Baldwin–United, supra,* 770 F.2d at 335, *quoting Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970); (3) enjoining a state court seeking to entertain an action over the same res; and in an *in rem* action, when the parallel state action will defeat the already attached jurisdiction of the federal court. *Baldwin–United, supra,* 770 F.2d at 336; *see Kline v. Burke Construction Co.,* 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922); *Cf. Vendo Co. v. Lektro–Vend Corp.,* 433 U.S. 623, 642, 97 S.Ct. 2881, 2893, 53 L.Ed.2d 1009 (1977); (4) enjoining repeated, baseless, vexatious litigation by the same plaintiff in a federal court, *Safir v. United States Lines, Inc,* 792 F.2d 19, 23–24 (2d Cir.1986); and (5) in certain actions involving parallel actions in foreign courts, *see Laker Airways v. Sabena, Belgian World Airways,* 731 F.2d 909, 926–34 (D.C.Cir.1984).

In addition to those general circumstances, under the All Writs Act courts may issue injunctions to enjoin other proceedings when the unique character of the litigation requires that relief be determined "flexibly." *New York Telephone, supra,* 434 U.S. at 173, 98 S.Ct. at 372. A federal court has the power "to issue commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in the exercise of jurisdiction otherwise obtained." *Id.* at 174, 98 S.Ct. at 373. The All Writs Act also grants courts the authority to bind non-parties to an action "when needed to preserve the Court's ability to reach or enforce its decision in a case over which it has proper jurisdiction." *Baldwin–United, supra,* 770 F.2d at 338; *see New York Telephone, supra,* 434 U.S. at 172, 98 S.Ct. at 372, *cf. Vuitton et Fils*

*S.A. v. Carousel Handbags,* 592 F.2d 126, 129 n. 6 (2d Cir.1979) (discussion in dicta).

■■■ The existing authority on injunctions under the All Writs Act indicates that a federal court, under special circumstances, has the power to enjoin a parallel proceeding. In addition, a federal court may invoke the All Writs Act to bring before it parties whom it otherwise does not have personal jurisdiction over. The special circumstances of this IBT litigation warrant this Court's exercising its powers under the All Writs Act and enjoining the subordinate entities from litigating matters pertinent to the Consent Decree in any other forum.

### 1. Jurisdictional Basis of this Court over the Suit and the Parties

■■ A threshold question is to establish the independent jurisdictional basis of this Court over all litigation which relates to the Consent Decree. Paragraph K.16 of the Consent Decree vests this Court with just such jurisdiction. That provision reads:

> "This Court shall retain jurisdiction to supervise the activities of the Administrator and to entertain any future applications by the Independent Administrator or the parties. This Court shall have exclusive jurisdiction to decide any and all issues relating to the Administrator's actions or authority pursuant to this order."

Consent Decree at 25.

Paragraph K.16 establishes the procedure that all matters relating to the administration of the Consent Decree are to be reviewed by this Court upon an Application, a procedural device settled upon by the parties.[12] The Independent Administrator is authorized to make Applications on behalf of the Election Officer and the Investigations Officer. Paragraph K.16 of the Consent Decree permits other parties to file Applications to the Court as well.

Some subordinate entities have argued that ¶ K.16 vests this Court with exclusive jurisdiction over the actions of the Independent Administrator, but not the two other Court Officers, the Election Officer or the Investigations Officer. As an example, proponents of this argument point out that since the Chicago suit challenges actions of the Election Officer, it does not directly involve the Independent Administrator and may be brought in the tribunal of the plaintiff's choice. The New Jersey suit similarly involves discovery requests by the Investigations Officer.

Such an argument completely ignores the structure of the Consent Decree and its organization of the duties of the Court Officers. The Consent Decree calls for the Independent Administrator to oversee and coordinate actions of the other Court Officers. As a practical matter, any activities undertaken by the Election or Investigations Officers involve the Independent Administrator. In overseeing the Consent Decree, this Court would has no formal contact with the activities of the Court Officers other than through Reports or Applications by the Independent Administrator.

As an example, the complaint in the Chicago suit seeks relief from the October 18, 1989 Opinion of this Court, which was issued in response to proceedings initiated by Application II by the Independent Administrator. The Independent Administrator filed Application II after a request by the Election Officer. The original basis of the dispute over the scope of the duties of the Election Officer was properly brought before this Court in accordance with the procedure spelled out for seeking review or deciding questions that arise in the course of the implementation of the Consent Decree.

I find that to the extent that any party finds ¶ K.16 unclear, that provision vests this Court with exclusive jurisdiction to determine matters concerning the activities of all the Court Officers, as they are brought before this Court by the procedures spelled out in the Consent Decree. The parties to

---

**12.** Applications regarding the administration or interpretation of the Consent Decree must be differentiated from appeals of disciplinary decisions or decisions of trusteeship by the Independent Administrator. Paragraph F.12(A) provides for appeals of these actions to this Court within 14 days of the Administrator's decision. Consent Decree at 7–10.

the Consent Decree plainly anticipated the very circumstances which the collateral lawsuits now highlight: Disputes relating to the implementation of the Consent Decree should be brought before a singular tribunal—this Court. The parties intended that all judicial oversight of the Consent Decree be concentrated in one tribunal for efficiency and consistency.

To interpret the Consent Decree as vesting this Court with a jurisdictional nexus over any and all matters to the implementation of the Consent Decree in no way impedes the power of sister federal courts in other districts to hear cases properly before them involving the IBT or its subordinate entities. No ruling of this Court even intimates that this Court has jurisdiction over all litigation involving the International IBT or its hundreds of subordinate entities. For example, should a subordinate entity bring an action in any federal district court for breach of a food service contract involving their Christmas party, this Court would have absolutely no power or interest in enjoining such litigation.

### 2. Special Circumstances Surrounding the IBT Litigation

To be sure, the litigation before this Court now embodied in the Consent Decree is an unusual case which was concluded by a unique settlement. To this end, existing law and the situations where similar actions have been taken are helpful by analogy, but the unprecedented circumstances surrounding the parties before this Court warrant special consideration.

The Government initiated the RICO suit against the IBT in its totality and the GEB individually. On the eve of trial, the parties settled the suit and entered into the Consent Decree. As stated earlier, the Consent Decree sought to institute real electoral reform into a union not known for its democratic nature, and rid the IBT of the hideous influence of organized crime, whose taint has tarnished the IBT for decades. To this end, the Consent Decree called for the creation of three Court Officers; the Election Officer to pursue democratic elections, the Investigations Officer

to bring charges, and the Independent Administrator, who would oversee the whole process and scrutinize the IBT's actions. Importantly, the Consent Decree called for the IBT to pay for the work of the Court Officers. Finally, the Consent Decree is to run for a period of three years, ceasing after the IBT's 1991 elections for International Officers.

As the Consent Decree went into effect this spring, the Government and the IBT expected to implement its reforms in a spirit of cooperation and a unity of purpose. Unfortunately, the honeymoon ended by August, and the IBT and the Court Officers began sinking into a confrontational posture. As cooperation ebbed and obstreperousness mounted, the Court Officers and the IBT began seeking refuge in this Court. First over funding matters, and then over increasingly larger issues, the day-to-day implementation of the Consent Decree became mired in a morass of accusations, venomous correspondence, Applications, hearings, and ultimately, decisions by this Court, and the inevitable appeals. The specific litigation postures were outlined in § II of this opinion.

This litigation has already consumed a great deal of time, expense, and energy from the Government, the IBT, and this Court, all in the hope that these resources have gone to achieve a better IBT for its members. This litigation is a unique attempt to reform the IBT, and such a situation warrants exercising this Court's extraordinary powers under the All Writs Act.

### B. Viability of the Injunctions

Both existing authority and the specific needs of this litigation support the issuance of an injunction barring suits in any forum other than this Court. The nature of the Consent Decree—a nationwide remedial scheme intended to promote electoral reform and root out the influence of organized crime in the nation's largest labor union—seems to be a special circumstance of the magnitude that warrant courts issuing injunctions of this type.

The Government contends that this situation is analogous to those in *Baldwin–United,* and *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988), two recent instances where courts in this Circuit have issued anti-suit injunctions under the All Writs Act. Many of the subordinate entities distinguish these two cases, and urge this Court to view the Government's petition with restraint, since, they claim, no authority supports this injunction. Further, some subordinate entities offer authority that they claim precludes this Court from taking this step. A detailed examination reveals that *Baldwin–United* and *Yonkers* present persuasive precedents, and the arguments of the subordinate entities are unconvincing.

*In re Baldwin–United Corporation, supra,* involved multi-district litigation to recover monies from broker-dealers who traded in the securities of the bankrupt Baldwin–United Corporation or its subsidiaries. The action consolidated over 100 securities lawsuits involving some 100,000 holders of Baldwin–United annuities against 26 broker-dealers. *Baldwin–United, supra,* 770 F.2d at 331. As the extensive litigation wore on, the district court arrived at a settlement between the majority of broker-dealers and plaintiffs, who had been certified as a class for settlement purposes. Some states sought to pursue separate state remedies, and twenty two states opposed the district court's settlement as inadequate. The New York Attorney General then notified the defendants that it intended to file suit in state court. The defendants then moved for, and the district court issued an injunction enjoining any states from bringing actions seeking additional relief for any plaintiff in any forum, which was affirmed on appeal.[13] The injunction was prospective, and banned all future suits based on one actual suit.

The Second Circuit found that the injunction was necessary for the district court to preserve its jurisdiction and protect its judgments, especially in a consolidated federal action. Repetitive suits would subvert years of work and subject the defendants to "multiple and harassing actions." *Baldwin–United, supra,* 770 F.2d at 337. Since the success of the consolidated action in the district court depended on achieving a final resolution, the possibility of subsequent lawsuits would call into question "the certainty of any federal settlement." *Id.*[14]

In *Yonkers Racing Corp. v. City of Yonkers, supra,* the district court issued an injunction under the All Writs Act to require a state court suit filed by private entities located in the City of Yonkers—that sought to enjoin the condemnation of part of their property pursuant to the consent decree between the City of Yonkers, the Government, and the NAACP—be removed to the district court. The Second Circuit upheld the injunction since the suit in state court might subject the City of Yonkers to inconsistent judgments from different courts. *Id.* at 863. The court found the private entities were in a position to "frustrate the implementation of the consent decree," *Id.* Testifying to the unique nature of the *Yonkers* case, the court found it "the sort of extraordinary circumstance envisioned by the All Writs Act." *Id.* at 864.

■ Some subordinate entities argue that this Court cannot issue injunctions against sister federal tribunals, even under the All Writs Act, while others distinguish *Baldwin–United,* and *Yonkers.* Both these arguments are misplaced. While *United States v. Birrel,* 276 F.Supp. 798 (S.D.N.Y.1967) dismisses the All Writs Act as the basis for an inter-court injunction, it also distinguishes the situation it encountered from those where a court faces "col-

---

13. The language of the district courts injunction was broad. That order prevented the "State of New York and all other persons having actual knowledge of the order" from "commencing any action or proceeding of any kind against any defendant ..." *Baldwin–United, supra,* 770 F.2d at 334.

14. The Court noted that while enjoining a sovereign state from litigation claims arising under its own laws in its own courts, raised issues of comity were outweighed since, as in school desegregation cases, "it would be intolerable to have conflicting orders from different courts." *Baldwin–United, supra,* 770 F.2d at 337.

lateral proceedings which threaten[ ] to undermine the previously acquired jurisdiction of the enjoining court."—exactly the situation before this Court. *Birrel, supra,* 276 F.Supp. at 811 n. 12. *Newman v. Graddick,* 740 F.2d 1513 (11th Cir.1984), never addressed the All Writs Act at all.[15]

The IBT litigation presents this Court with the sort of extraordinary and unique circumstances that warrant an injunction under the All Writs Act. This RICO litigation resulted in the Consent Decree which created a nationwide remedial scheme whose oversight and judicial review were by agreement vested in this Court, which has expended a significant amount of time and resources. Enjoining any pertinent collateral lawsuits before other tribunals, past and future, is necessary "in aid of its jurisdiction" over this case. To that end, three major factors require that this Court issue this injunction "in aid of its jurisdiction," (1) inconsistent judgments, (2) time pressure, and (3) judicial economy.

First, there exists a significant risk of subjecting the Consent Decree to inconsistent interpretations and the Court Officers to inconsistent judgments. Allowing such litigation would encourage forum shopping by subordinate entities seeking a sympathetic ruling. The subordinate entities are located in all fifty states and Canada, and all 91 federal judicial districts. Should each subordinate entity chose to litigate its own questions that arise under the Consent Decree, there might potentially be different interpretations of the Consent Decree applying to different subordinate entities. Concentrating all Consent Decree related litigation in one forum allows uniform and congruous interpretations applying to all subordinate entities that seek to litigate disputes.[16]

Similarly, the subordinate entities could obtain judgments variant in nature against the Court Officers. One specific course of action by the Court Officers might be deemed permissible against some subordinate entities, but be held a transgression of their authority if taken against others. In order to allow the Court Officers to function properly and continue their important work, they must have clear and consistent mandates on their roles emanating from a single source.

Second, the Consent Decree is of limited duration—for three years—and widespread litigation across the county would subvert the reform by bogging the Court Officers down in duplicitive, harassing, and perhaps frivolous litigation. The Court Officers are charged with an enormous task, to achieve substantive reform in the IBT during their limited tenure. Allowing multitudinous suits before a multiplicity of forums would have the practical effect of requiring the Court Officers to spent an inordinate amount of time responding to these suits.[17] The Court Officers should not be diverted by frivolous judicial skirmishes but should be free attend to their momentous duties.

15. Indeed, federal courts may issue inter-court injunctions against sister tribunals in certain situations, even under the less authoritative basis of Rule 65. For instance, a court may enjoin other suits seeking to litigate class-action issues. *See Robertson v. National Basketball Association,* 413 F.Supp. 88 (S.D.N.Y.1976). A court may enjoin duplicitive proceedings which seek to relitigate issues properly before it. *See generally National Equipment Rental Ltd. v. Fowler,* 287 F.2d 43 (2d Cir.1961); *Meeropol v. Nizer,* 505 F.2d 232 (2d Cir.1974); *Bausch & Lomb, Inc. v. Alcide Corp.,* 684 F.Supp. 1155 (W.D.N.Y. 1987); *Roth v. Bank of the Commonwealth,* 583 F.2d 527 (6th Cir.1978).

16. For example, the Chicago suit baldly seeks to relitigate issues settled by this Court involving the interpretation of the word "supervise" and phrase "1991 Election" as used in ¶ 12(D) of the Consent Decree. This Court interpreted these terms in their broadest and most proactive meaning. Should the Chicago plaintiffs ultimately be successful on the merits of their suit, those terms could be interpreted narrowly as applied to those plaintiffs. Such inconsistency is clearly a risk of allowing collateral lawsuits.

17. Some subordinate entities argue that since the IBT pays for the Court Officers, and they could hire further staff at IBT expense if responding to the collateral suits became too onerous. This would exacerbate the already peculiar situation of the IBT paying to litigate against itself. That some segments of the IBT would be advocating this absurd circumstance indicate that they would prefer the Court Officers to litigate their authority rather than accomplish reform.

Third, judicial economy demands that similar issues not be litigated multiple times in different districts and weigh toward issuing this injunction. As discussed earlier, to allow subordinate entities choice of forum would potentially spawn collateral lawsuits in every judicial district. Most collateral lawsuits, like those already filed, will undoubtedly seek to relitigate issues adversely decided by this Court. Those that present new and important issues will have in this Court a ready forum to litigate their claims. Weighing these factors against the competing concerns of deference to sister tribunals, the extraordinary nature of the remedy sought, and respect for the choice of forum of the subordinate entities, still justifies the injunction.

The subordinate entities argue that the factors of (1) their constitutionally protected choice of forum, (2) no personal jurisdiction, (3) no actual suits (4) the possibility of transfer, and (5) respect for the equal status of sister federal tribunals militate against the issuance of this injunction. Least persuasive is the contention that limiting the subordinate entities' choice of forum violates either fairness or their constitutional rights. Limiting suits relating to the Consent Decree to this forum in no way denies any entity right of access to air their grievances, but instead requires they litigate in one forum. No constitutional rights are violated or even implicated.

■ Virtually all subordinate entities argue that this Court has no personal jurisdiction over them, and a lesser number claim it has no subject matter jurisdiction, as well. These contentions ignore the fact that personal jurisdiction is not required to bind such entities under the All Writs Act. The All Writs Act gives the Court the power to bind those who are "not parties to the original suit." *Baldwin–United, supra*, 770 F.2d at 338 *quoting New York Telephone, supra*. Even so, the RICO statute provides for nationwide personal jurisdiction, and this ultimately is a RICO matter. 18 U.S.C. § 1965(d). In addition, three actual lawsuits constitutes a sufficient basis for an injunction. Actual suits by all potential filers is not a predicate to

the issuance of an anti-suit injunction under the All Writs Act. *Baldwin–United, supra*, 770 F.2d at 337.

■ Also unpersuasive is the argument that if a collateral lawsuit is filed in another court, the Government or Court Officers may move the other tribunal for a transfer of venue to this Court. Even if successful, such motions still siphon the time and energy of the Court Officers and the Government, and waste judicial resources. In addition, motions take time to decide, and under the Consent Decree, time delayed is time lost.

■ Finally, while enjoining litigants from filing suit in otherwise competent sister federal tribunals is a extreme step, this Court believes the special factors discussed earlier in favor of such a step outweigh this concern. Along these lines, some subordinate entities argue that the Government has less drastic means to effect the goal of channeling all Consent Decree related litigation to this Court, since it could either move to transfer venue in each situation or even institute multi-district litigation procedures. Under the All Writs Act, such predicate steps are unnecessary, and the Government is under no obligation to pursue these intermediate steps before seeking an injunction.

## IV. The Binding Effect of the Consent Decree on IBT Subordinate Entities

While the explicit issue now under consideration involves whether this Court may issue an injunction preventing the subordinate entities from collaterally litigating matters under the Consent Decree in any other forum other than before this Court, the underlying conflict is really somewhat different. Holding that the IBT or any subordinate entity must bring Consent Decree related litigation in this forum merely bandages the symptomatic conflict, whether IBT subordinate entities and the entire rank and file are bound by the Consent Decree. Virtually every subordinate entity asserted that since they were not parties to the underlying RICO action, they are not bound by the Consent Decree.

The subordinate entities raise two arguments in support of their contention that they are not bound by the Consent Decree. First, they argue that during the underlying RICO litigation, the IBT moved this Court to join all subordinate entities as necessary parties under Rule 19 of the Federal Rules of Civil Procedure. On March 6, 1989, this Court denied that motion. Second, they that assert that under the recent Supreme Court case of *Martin v. Wilks*, — U.S. —, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)—issued after the signing of the Consent Decree—since the subordinate entities were determined not to be indispensable parties, they were neither parties to the Consent Decree nor bound by its strictures.

### A. The Denial of Joining Subordinate Entities as Indispensable Parties

In the first prong of this reasoning, the subordinate entities assert that since they were not parties to the underlying litigation, they are not bound by its resolution—the Consent Decree. Virtually all subordinate entities that responded to the nationwide order to show cause and filed papers reiterated that the IBT moved this Court during the active phase of this litigation to join all subordinate entities as indispensable parties under Rule 19(a) of the Federal Rules of Civil Procedure. The briefs submitted by subordinate entities exhibit a remarkable similarity in support of this argument.

The subordinate entities point out that in an Opinion & Order of this Court dated March 6, 1989, 708 F.Supp. 1388 (S.D.N.Y. 1989) (the "March 6, 1989 Opinion"), this Court denied the IBT's request to join the subordinate entities as indispensable parties. The subordinate entities point to dicta in that opinion, where this Court specifically stated:

> In any event, it is apparent that although the outcome of this litigation may have ramifications for the conduct of business by the Subordinate Entities, they do not have an interest relating to the "subject matter of the action." The relief requested relates to the IBT. It does not directly affect the rights of the

Subordinate Entities. Moreover, to the extent that any rights of the Subordinate Entities are implicated, the IBT has an obligation to protect those interests. *Further, because these entities are not parties, any determination in this case would not be preclusive as to them.*

708 F.Supp. at 1404. (emphasis added.) The subordinate entities view this declaration, especially the emphasized passage, as exonerating them from any consequences they may incur in the implementation of the Consent Decree.

The Government contends that while the March 6, 1989 Opinion held that IBT subordinate entities were not indispensable parties under Rule 19(a) for the purposes of the underlying litigation, that determination should be limited to its specific context. The Government further offers that in the language in question, this Court ruled that the specific subject matter of the RICO action—ridding the IBT of the influence of organized crime through electoral reform and bringing charges against corrupt members—involved the International IBT and was outside the purview of subordinate entities.

The argument by the subordinate entities misunderstands the nature of the decision rendered in the March 6, 1989 Opinion and the character of their obligations under the Consent Decree. The March 6, 1989 Opinion denied the IBT's request to dismiss the complaint or require the Rule 19(a) joinder of all subordinate entities. The preclusive effect of this ruling must be limited to its specific context—whether the subordinate entities were indispensable parties for the purpose of obtaining the relief sought in the complaint. This Court ruled that the subordinate entities were not indispensable parties for that limited purpose.

The provisions agreed to in the Consent Decree altering the IBT Constitution affect the International IBT, and to a limited degree how it interacts with its subordinate entities. The Court Officers stand in the stead of the General President of the IBT and its GEB and their elections. As the March 6, 1989 Opinion stated, these mat-

ters are primarily in the realm of the International IBT, and did not warrant the Rule 19(a) joinder of the subordinate entities.

In the passage in question from the March 6, 1989 Opinion, this Court stated that the subordinate entities did not "have an interest relating to the 'subject matter of the action.'" 708 F.Supp. at 1404 (*quoting* Rule 19(a)). But this Court further declared that this action did incidentally implicate the rights of subordinate entities, and that the "IBT has an obligation to protect those interests." 708 F.Supp. at 1404. For this Court to now interpret its ruling as stating that the issues then in contention, and now resolved in the Consent Decree primarily were within the purview of the International IBT is wholly consistent with the intentions of the parties and the interests of fairness and justice.

The subordinate entities vigorously insist that they are independent bodies with their own Constitutions, distinct and separate from the International IBT. Despite the patriotic assertions of sovereignty and declarations of independence by the subordinate entities, the International IBT moved this Court to join the subordinate entities, and the International IBT now appears to have directed their responses in this situation as well.[18] In the March 6, 1989 Opinion this Court noted that "it is revealing that the Union has taken on the cause of these entities when, if the Union's argument is correct, these very entities could have attempted to intervene in this case to protect that interest." *Id.* Again, the International IBT and the subordinate entities seem to be asserting their independence at the most convenient moment.[19]

Accordingly, as a matter of interpretation of § II of the March 6, 1989 Opinion of this Court, the subordinate entities may not escape the strictures of the Consent Decree as a result of their failure to be joined as indispensable parties under Rule 19(a). The International IBT represented what interests the subordinate may have had in the subject matter of the underlying litigation, and the embodiment of the settlement of that litigation—the Consent Decree—reflects such representation.

### B. The Status of Subordinate Entities

■ The subordinate entities further argue that the recent decision of the United States Supreme Court in *Martin v. Wilks, supra,* frees them from being bound by the Consent Decree. The subordinate entities argue that applying the rule of *Martin*—that those not parties to a consent decree are not bound by it (or its remedial provisions)—emancipates them from this Consent Decree. This argument of the subordinate entities is a matter of first impression in this or any circuit, since *Martin v. Wilks* has only been recently decided—after the parties signed the Consent Decree—and in no published opinion have its rulings been specifically applied to an ongoing consent decree.

In *Martin v. Wilks,* the Supreme Court considered whether a group is precluded from collaterally challenging hiring decisions made by a public agency pursuant to a consent decree concluding a Title VII discrimination suit. In *Martin,* a class action suit by black firefighters in Birmingham, Alabama, resulted in desegregation and affirmative action consent decrees to integrate the Birmingham Fire Department. A group of white firefighters, who were not parties, intervenors, *amici,* or in any way involved in the original suit, subsequently challenged the consent decrees in a Title VII suit. This district court dis-

---

**18.** Exhibit A of the Declaration of Richard Mark, submitted on December 29, 1989 with the Government's response papers is an electronic mail message from the IBT Titan system. This message, styled as a memorandum from General President McCarthy to all IBT affiliates, stated the International IBT's position on the binding effect of the Consent Decree, and "suggested" ten legal theories that subordinate entities could use in their responses. These recommen-

dations are remarkably similar to arguments advanced in a large percentage of the briefs filed by the subordinate entities.

**19.** Contrast this position with earlier conflicts in the Consent Decree. The IBT vigorously opposed the expenditures proposed by the Court Officers in the name of saving its membership's monies.

missed the suit as an impermissible collateral challenge to a consent decree.

The Court affirmed the Eleventh Circuit's reversal of the district court, and allowed the group of white firefighters to collaterally challenge the consent decrees since they were not parties to the original suit. The Court based this finding on the principle that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party." *Id., quoting Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940). The Court concluded that the proper procedure for obtaining a judgment binding on a party is to join them under Rule 24(a) (intervention as of right), Rule 24(b) (permissive intervention), or Rule 19(a) (indispensable party), of the Federal Rules of Civil Procedure. The Court established one exception to this general rule: that in "certain, limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." 109 S.Ct. at 2184 n. 2.

The decision in *Martin* requires that this Court determine whether the International IBT "adequately represented" the interests of the subordinate entities when it negotiated and assented to the Consent Decree. The subordinate entities strongly deny that their interests were represented by the International IBT. Upon review of the pertinent facts and circumstances, this Court finds that the International IBT did "adequately represent" the interests of its subordinate entities to the degree required by the Supreme Court.

The subordinate entities first argue that during the litigation phase, this Court specifically denied them the right to intervene under Rule 19(a), the preferred course under *Martin*.[20] Second, the subordinate entities contend that the Constitutions of the International IBT and subordinate entities establish that the subordinate entities are independent bodies that stand in their own stead. Third, various subordinate entities

point out judicial authority holding that courts cannot bind locals to the decisions of the national union in situations involving both the IBT and other national unions.

In arguing that the subordinate entities should be bound, the Government stresses that the nature of the remedial action in the Consent Decree—creating Court Officers to stand in the stead of the General President and GEB on matters wholly under the control of the International IBT—meant that the signatories of the Consent Decree had the power and duty to represent the interests of the subordinate entities.

### 1. The Denial of the IBT's Motion to Join the Subordinate Entities as Necessary Parties under Rule 19(a)

The argument by the subordinate entities that this Court's denial of the motion by the International IBT to join them as indispensable parties under Rule 19(a) immunizes them from being bound by the Consent Decree has already been dismissed. As discussed in a previous section, the ruling by this Court found that the specific relief sought by the Government in the complaint was wholly within the Constitutional purview of the International IBT and the GEB. This Court did not deny the IBT's motion because the subordinate entities were unaffected by the litigation, but only held the International IBT had the legal and Constitutional authority to represent its members for the relief sought. As a result, the subordinate entities were not "necessary parties" to the litigation. In addition, this Court charged the International IBT to represent the interests of the subordinate entities to "the extent they are implicated." 708 F.Supp. at 1404.

### 2. The Power of the International IBT to Bind the Locals

In order to satisfy the *Martin* criteria of "adequate representation" and by their ac-

---

**20.** Some carry this argument a step further, and argue that the Government now seeks to "bootstrap" them into being bound by the Consent Decree when they initially opposed their joinder. The Government excluded the subordinate entities at the active litigation phase, the argument goes, and now seeks to bind them to this settlement through the back door. For reasons to be discussed, this argument has little bearing on the actual situation at bar.

tions bind the subordinate entities to the Consent Decree, the explicit parties to the Consent Decree must have had such actual legal authority under the IBT Constitution; in other words, an agency relationship must have existed for these purposes. The subordinate entities contend that the signatories to the Consent Decree—the International IBT and the members of the GEB—do not have the Constitutional authority to bind them to the Consent Decree and its remedial scheme. In addition, the subordinate entities point to judicial authority holding that subordinate entities of national or international unions such as the IBT are not bound by decisions of the larger entity—that they cannot be agents of the International IBT.

Both the organizational structure of labor unions in general and the IBT in particular refute the assertions of independence by the IBT subordinate entities and support the notion that the explicit signatories to the Consent Decree had the power to bind the entire IBT, including all subordinate entities. Both the unique circumstances of the current IBT litigation and the standards outlined by previous Courts interpreting similar questions—whether the IBT Constitution binds the subordinate entities to actions of the International IBT (and vice-versa)—supports binding the subordinate entities in this instance. The International IBT is an unincorporated association made up of over four layers of structure: the International Union, the state and area conferences, the joint councils, and the locals. Often forgotten, however, is that under all lies the rank and file.

The International IBT and all of its subordinate entities are merely structures created to represent and serve its constituent membership. Indeed, the laws governing lawsuits against labor unions embodies the underlying philosophy that a union is no more than its membership. *See, e.g.,* 29 U.S.C. § 185(b). Legally, an unincorporated association is a collective substitute for its members individually. *See United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 385–92, 42 S.Ct. 570, 574–76, 66 L.Ed. 975 (1922). Under the IBT Constitution, all members of the Union—officials and rank and file alike—are jointly members of both their individual local and the International IBT. IBT Constitution, Art. II, § 2(a); Art. IX, § 3.

 Courts may look to the amount of control the International exercises over the locals as permitted by the IBT Constitution when determining if actions of the International implicate local unions. In *International Brotherhood of Teamsters v. United States,* 275 F.2d 610 (4th Cir.) *cert. denied,* 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960), the Fourth Circuit looked to the IBT Constitution and determined that an officer of a local was an agent of the International IBT. That court examined the IBT's Constitutional provisions regarding membership, internal affairs of locals, external affairs of locals, and the right to exercise direct control, and taken together found they "showed such extensive control and direction of the local as to warrant the conclusion that the local is a component of the International." *Id.* at 614. While this decision has subsequently been interpreted to require an examination of the particular circumstances at bar, the pertinent provisions are applicable in this situation and still good law.[21]

---

**21.** Many subordinate entities argue that later cases have overruled *IBT v. U.S., supra,* or limited its rulings to its facts. But the provisions relevant to this situations are still are good law. In *Shimman v. Frank,* 625 F.2d 80, 96 n. 36 (6th Cir.1980) in dicta the Court rejected that blanket proposition that the IBT Constitution makes locals agents of the International for all purposes, but instead a court should look to the "nature and extent of actual control." *Id.* In *Barefoot v. International Brotherhood of Teamsters,* 424 F.2d 1001 (10th Cir.1970), that court found the all-inclusive language of *IBT v. U.S.* limited to instances of trusteeship, but still held that courts must look at the situation in question. That situation differs significantly from the current one. Even when the union is not the IBT, courts look to the substantive relationship. In *Baldwin v. Poughkeepsie Newspapers, Inc.,* 410 F.Supp. 648 (S.D.N.Y.1976) (Ward, J.) the court considered the limiting language of *Barefoot* to the extent it required an independent consideration of the particular circumstances at bar. In any event, the union in question was not the IBT. Other cases following this line in requiring a substantive examination to determine the agency relationship include *Rodonich v. House*

Indeed, in a similar perusal of relevant provisions of the IBT Constitution, the Ninth Circuit found the International IBT had the Constitutional power to bind its locals to a Title VII remedial consent decree. *United States v. Navajo Freight Lines*, 525 F.2d 1318 (9th Cir.1975). The *Navajo Freight* court examined IBT Constitutional portions and determined that the "picture that emerges from an examination of the Teamsters Constitution is one of a strongly centralized union that has secured itself against the weaknesses that attend confederations." [22] *Navajo Freight, supra*, 525 F.2d at 1324.

Subordinate entities seek to distinguish *IBT v. U.S.* and *Navajo Freight* and offer alternative authority to support their argument that the International IBT cannot bind the subordinate entities. In *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979) the Supreme Court found that the United Mine Workers were not agents for their locals and therefore not liable under *respondeat superior* for damage caused in wildcat strikes. This case may be distinguished since the Court held that binding one labor entity to its subordinate is determined by "their fundamental agreement of association." *Id.* at 217, 100 S.Ct. at 414. *Carbon Fuel* does not preclude holding subordinate entities bound to the actions of the International.

Similarly, *United States v. International Union of Petroleum & Industrial Workers (IUPIW)*, 870 F.2d 1450 (9th Cir. 1989) also does not preclude binding the subordinate entities. In *IUPIW*, The Ninth Circuit declined to force that union to comply with portions of a subpoena requesting election records, since such powers were unsupported by the IUPIW Constitution. *Id.* 870 F.2d at 1453. The *IUPIW* court conducted the prudent inquiry and looked to the degree of control of the International Union over the local, both Constitutional-ly, and practically. The *IUPIW* court looked for "*actual*," rather than "theoretical" control. *Id.* at 1454.

This review of pertinent authority reveals that prudent courts should look to two factors to determine whether subordinate entities are agents of the international union, thus indicating "actual representation": the constitutional relationship between the union's strata, and the real degree of actual control the international union exercises over its subordinate entities. Both of these factors should be considered in the context of the particular situation. This Court believes that in considering both the relationship between the International IBT and the subordinate entities under the IBT Constitution, and the actual degree of control exerted by the International IBT in the context of this unique case, both factors warrant the findings of agency and control necessary to indicate "actual representation."

a. Constitutional Control

A review of the relevant provisions of the current version of the IBT Constitution supports binding the locals to the Consent Decree. The preamble to the Constitution hails the IBT as "one great labor organization." (Art. I, § 1). Membership in the IBT is open to all, and all IBT rank and file are dual members of their local, and the International IBT. In addition, members must comply with the rulings of the GEB. Indeed, the GEB is authorized to change provisions relating to membership and approve contracts. (Art. II, § 2).

The General President is vested with significant powers and oversight authority over all facets of the IBT structure. The General President may interpret the IBT Constitution, the Constitution and By-laws of any subordinate entity, and settle all inter-IBT disputes, subject to the approval of the GEB. (Art. VI, 2(a)). He may suspend, revoke, or place into trusteeship any

*Wreckers Union Local 95*, 817 F.2d 967 (2d Cir. 1987) (not IBT); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C. Cir.1988) (not IBT); and *Plumbers & Pipefitters v. Plumber & Pipefitters*, 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981) (not IBT).

**22.** The Court looked at the following Constitutional provisions: Art. I, § 1 (preamble); Art. XI, § 2(a) (membership); Art. XVI, § 1, Art. Vi § 1(f), Art. X, §§ 4, 10(a) (subordinate bodies); Art. VI, § 5 (trusteeship). *Navajo Freight, supra*, 525 F.2d at 1321.

subordinate entity that refuses to comply with his rulings. (Art. VI, § 2(b)). The General President may place any subordinate entity in trusteeship for any number of malfeasances, including "being conducted in a manner as to jeopardize the interests of the International Union." (Art. II, § 5).[23] The power of the General President has special import for this particular situation, since the Consent Decree vests the Court Officers with disciplinary authority at least equal to that of the General President.

The GEB has authority to oversee the operation of virtually every facet of the IBT. (Art. IX, § 1). The GEB may review disciplinary decisions by the subordinate entities. (Art. II, § 3). The GEB has wide ranging authority to discipline and suspend IBT subordinate entities or members. (Art. IX, § 2(b) [subordinate entities]; § 3 [members]). The GEB may approve any number of financial reimbursements in connection with legal proceedings, both for the International IBT and subordinate entities. (Art. IX, § 9(a)).

The International IBT, through the General President, the GEB and the Secretary Treasurer, has broad discretion over the disbursement and oversight of IBT funds. (*See generally* Art IV, § 3 [meetings]; Art. V [salaries]; Art. VII [Secretary–Treasurer]; Art. IX, § 9(a) [legal expenses]; Art. IX, § 10 [retirement plans]; Art. X [taxes, audits, IBT property]; Art. XI [finance committee]; Art XII, § 5 [expenses in strikes and settlements]; Art. XII, § 12 [out-of-work benefits]).

The International IBT retains control over a significant amount of the activities conducted by the subordinate entities. The International sets controls on strikes and settlement votes. (Art. XII, § 1). The GEB approves large area strike committees and approves many of their decisions in strikes and settlements. (Art. XII, § 2). The International IBT sets the amount of compensation to be paid striking workers (Art. XII, § 14). The IBT sets the conditions for the charters of subordinate enti-

ties, and many of their internal procedures. (Art. XIV [locals]; Art. XV [joint councils]; Art. XVI [area conferences]). The rules governing transfer between subordinate entities are also controlled centrally. (Art. XVII).

Taken separately and as a whole, these pertinent provisions of the IBT Constitution reveal a strongly centralized structure.

### b. Actual Control

Indeed, the behavioral characteristics relied upon by other courts determining similar questions strongly militate toward a finding of actual control. In this instance, the International IBT exercised significant control over the subordinate entities, which demonstrated none of the factors courts look to in separating Internationals from subordinate entities. In the initial active suit phase, the International IBT litigated the underlying RICO suit, spoke for the subordinate entities in their motion to join under Rule 19(a), and conducted settlement negotiations with a team that included lawyers for subordinate entities.

Not only did the International IBT behave in a manner consistent with control over the subordinate entities, but its officers attested to the validity of the Consent Decree's Constitutional changes before the United States Senate. Testifying before the United States Senate, General Counsel Grady averred that the provisions of the Consent Decree were not merely a settlement between the individual signatories and the International IBT alone, and the Government, but that the Consent Decree "is the Constitution of the International Brotherhood of Teamsters." *Federal Government Use of Trusteeship under the RICO Statute: Hearings before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate*, 101st Cong., 1st Sess. 31 (April 4, 1989).

The International IBT has similarly maintained significant control over the subordinate entities during the current period of the implementation of the Consent Decree.

---

**23.** The trusteeship powers of the General President, and the trustee he ultimately appoints, are significant. (Art. VI, § 5 [power of General President]; Art. VIII (trustees).

The International IBT vigorously fought to control the Court Officers through the provisions in the Consent Decree granting them oversight over the expenses of the Court Officers. *See* October 18, 1989 Opinion, 723 F.Supp. at 202. The International IBT justified such actions as necessary to protect its membership's monies. In this current dispute, the International IBT sent each and every subordinate entity a communication via its internal electronic mail system informing them of the nationwide order to show cause and "suggesting" ten relevant points of argument to raise in opposition. The overwhelming majority of the briefs received virtually mirrored the recommendations of General President McCarthy. *See* Exhibit A, Declaration of Richard Mark. (December 27, 1989).

### 3. Adequate Representation

Both the explicit terms of the IBT Constitution, and the implicit actions of the parties indicate that the International IBT had the actual legal authority and exercised the requisite degrees of control to "adequately represent" the subordinate entities in negotiating and signing the Consent Decree as required by *Martin.*

Such a detailed factual review of the relationship between the International IBT and the subordinate entities is even unnecessary to find the International IBT "adequately represented" the subordinate entities. Courts interpreting what constitutes "adequate representation" for the purposes of Rule 24(a)(2) find that the parties seeking to intervene must show that they

"have an interest not adequately represented by a party to a lawsuit simply because it has a motive to litigate different from the motive of an existing party. So long as the party has demonstrated sufficient motivation to litigate vigorously and to present all colorable conten-

tions, a district judge does not exceed the bounds of discretion by concluding that the interests of the intervenor are adequately represented."

*Natural Resources Defense Council, Inc. v. New York State Department of Environmental Conservation,* 834 F.2d 60, 61–62 (2d Cir.1987).

This Court made this very determination in denying the IBT's motion to join the subordinate entities. The review of the International IBT's actions since the Consent Decree further attest to their determination to "litigate vigorously and present all colorable contentions." *Id.*

Indeed, the Court has further determined the unity of interest of the subordinate entities and the International IBT in the implementation of the Consent Decree in the November 2, 1989 Opinion. The November 2, 1989 Opinion confronted the question of whether Anthony Hughes—who was not an explicit party to the underlying litigation that led to the Consent Decree—should be bound by strictures. In the motions for injunctions by Friedman and Hughes presented in response to Application III, Hughes argued that since he was not a party to the underlying litigation or a signatory of the Consent Decree, he, unlike Friedman, should not be bound by the Consent Decree's strictures.

The November 2, 1989 Opinion held that Hughes was bound to the Consent Decree since the International IBT represented his interests in the underlying litigation and the implementation of the Consent Decree. In addition to finding "adequate representation,"[24] this Court found the remedial goals of the Consent Decree—to promote free elections and root out corrupt officials—squarely in the interests of the IBT rank and file as a whole, and the public at large.[25]

---

**24.** This Court ruled as follows:

The International IBT, as the elective and administrative leadership of the IBT membership, litigated the suit and entered into the Consent Decree as the representative of its membership and considered the Consent Decree consonant with its member's interests. In fact, the only logical purpose for the existence of the International IBT is to represent

and protect is constituent members, including representing the IBT rank and file as a whole in lawsuits."

November 2, 1989 Opinion, at 14.

**25.** This Court reasoned:

"Indeed, the Consent Decree appears to contravene the interests of only two classes of IBT members; the election oversight may im-

The Court in *Martin* based its decision on what it considered the inherent unfairness of binding a non-party to litigation. An important subtext in that decision was the nature of the underlying suit and the subsequent remedial relief. The current situation may further be distinguished by considering those factors.

The Consent Decree in this IBT situation attempts to instill democratic, fair, secret ballot elections into a union not known for fairness or strict adherence to democratic principles in its elections and root out corrupt officials in an association historically tainted by organized crime. The remedial scheme seeks to ensure fair elections and establishes a process to expunge corrupt officers. This Consent Decree represents an unprecedented attempt to reform the nation's largest labor union. Undeniably, fair elections and honest officials are squarely in the interests of the membership as a whole.

Contrast this situation with that considered by the Supreme Court in *Martin.* The Birmingham relief involved alterations in hiring and promotion by a public agency based on considerations of race as a factor. The white firefighters may have had their own Title VII civil rights infringed upon by those consent decrees. Their absence from the litigation may have resulted in some curtailing of those basic rights.[26]

The November 2, 1989 opinion also distinguished *Martin* on the grounds that it involved civil rights litigation, and the nature of the remedial scheme was significantly different from this situation. This Court reaffirms and adopts that reasoning in this situation. *See* November 2, 1989 Opinion at 13–15.

Considering the legal and actual authority that the International IBT exercises over its subordinate entities, coupled with nature of the changes to the IBT Constitution, make apparent that the International IBT "adequately represented" its subordinate entities during the litigation and in the Consent Decree, satisfying the requirements of *Martin.* The subordinate entities are hereby determined to be bound by the Consent Decree and all its provisions.

### C. The Constitutional Changes of the Consent Decree

For the purposes of the implementation of the Consent Decree, it may even be irrelevant whether or not the subordinate entities are bound by its strictures or not. The Constitutional structure of the IBT and the validity of the Constitutional changes made by the Consent Decree may make that determination unnecessary. The Government argues that the provisions of the IBT Constitution and the Consent Decree provide ample authority to enforce its provisions. This argument has significant merit.

In respecting the authority of the Court Officers, the subordinate entities may merely be feeling certain negative consequences of Constitutional changes properly agreed to by the International IBT. The Court Officers' authority stems from the IBT Constitution itself, and the subordinate entities are bound to that document. Those changes created the three Court Officers—the Independent Administrator, the Election Officer, and the Investigations Officer.

The specific powers granted to the Court Officers expand the disciplinary and oversight authority of the General President.

---

peril unfairly elected officers, and the prosecution scheme may ultimately suspend corrupt union members.... To argue that it is unfair to bind Hughes—or any other member falling into one of these two threatened classes—to the scheme created by the Consent Decree's changes to the IBT Constitution is simply ludicrous."
November 2, 1989 Opinion at 15.

**26.** Further, the Supreme Court distinguished the *Martin* case from the nationwide remedial

scheme created by Congress in *Penn–Central Merger and N & W Inclusion Cases,* 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). While distinguishable from this situation, the Court nevertheless recognized that special factors may exist in large, nationwide, situations and discusses the *Martin* case in the context of "ordinary civil actions in a district court." *Martin, supra,* 109 S.Ct. at 2187. This IBT situation must be considered as a special, unique, and extraordinary proceeding.

Indeed, ¶ F.12 *et seq.* of the Consent Decree vests the Independent Administrator, who oversees the Court Officers, with no less disciplinary authority than the General President. This authority stems from the power of the General President to appoint a personal representative to act in his behalf, as he so directs. IBT Constitution, Art. VI, § 1(f). The Consent Decree's specifically enumerated powers of the Independent Administrator derive their validity from the IBT Constitutional provisions located at Art. VI, Art. XIX [disciplinary authority, trusteeship]. Further, the IBT Constitution specifically authorizes the General President to delegate (1) his authority to audit the books of any subordinate entity, Art. X, § 10; (2) the trial of any union member Art. XIX, § 5 and Art. XIX, § 10(b). The disciplinary and investigative provisions in the Consent Decree must be viewed as specific delegations of the Constitutional power of the General President.

The electoral reforms enumerated in ¶ F.12(D) of the Consent Decree were changes wholly within the realm of authority of the International IBT. The procedural and oversight powers the Consent Decree granted to the Election Officer involve the local elections for delegates to the International Convention. That this balloting for these delegates happens when the locals conduct their own elections was arranged for administrative convenience. The changes in the Consent Decree may affect subordinate entities and alter their behavior, but the election of these delegates relates to the International IBT. *See Donovan v. District Council 35,* 702 F.2d 25, 28 (1st Cir.1983); *see also Brock v. International Union, United Auto Workers,* 682 F.Supp. 1415, 1430–32 (E.D.Mich. 1988).

Finally, there can be little dispute that these changes are now part of the IBT Constitution. As referred to earlier, the General President and General Counsel both testified before the United States Senate that the Constitutional changes agreed to in the Consent Decree are part of the IBT Constitution. Testimony of James T. Grady, Esq., before Permanent Subcommittee on Investigations, *supra.* [27]

## V. The Validity of the Temporary Injunctive Relief

■ Virtually all subordinate entities have argued that the nationwide temporary restraining order issued by the this Court is procedurally flawed and necessarily void. Given the extraordinary scope of the nationwide order to show cause, the nationwide temporary restraining order complied with the rules for such orders as spelled out in Rule 65(b). The nationwide TRO was intended only to preserve the status quo pending a decision on the All Writs Act injunction.

■ Further, the time calculated for the duration of the nationwide TRO was in full compliance with the timing provisions of Rule 6(a), which excludes weekends and holidays when calculating periods of time in any Rule of Civil Procedure that is less than 11 days. Innumerable briefs filed by IBT subordinate entities called for the dissolution of the nationwide TRO, since January 2, 1990 was longer than 10 days from the signing of the nationwide TRO on December 15, 1989. But the timing provisions of Rule 6(a) indicate that the period of the nationwide TRO was proper. Part of the confusion stems from the fact that Rule 6(a) was amended April 29, 1985 to be effective August 1, 1985, and that change increased the time period when weekends and holidays would be excluded from 8 days to "less than 11 days." Rule 6(a) of the Federal Rules of Civil Procedure and Advisory Committee Notes. January 2, 1990 was the tenth day of the nationwide TRO as calculated by Rule 6(a), properly

---

**27.** Some subordinate entities have raised the specter that the defendants to the initial suit may have had ulterior motives, such as their own financial or professional stature at stake when they negotiated and signed the Consent Decree. These accusations that the defendants individually breached their fiduciary duty to the IBT as a whole are serious charges if substantiated, but in any event outside the scope of this order. Regardless, the Government claims the Art. XXVI, § 2 authorizes the GEB to bind the membership to this settlement.

excluding Saturdays, Sundays, or Holidays from the computation of time.

No evidentiary hearing is necessary, since the permanent injunction is being entered pursuant to the All Writs Act, not Rule 65. Finally, the Government showed good cause for an extension of the original ten-day period, which was found by Order of this Court dated January 2, 1990.

### CONCLUSION

Accordingly, the Government's request for a permanent injunction pursuant to the All Writs Act, 28 U.S.C. § 1651 is hereby granted. The plaintiffs in the Chicago suit and the New Jersey suit are hereby ordered either to dismiss their actions, or transfer those suits to this Court. All motions by subordinate entities are hereby denied in all respects.

SO ORDERED.