**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

Oct. 18, 1989.

See also, 708 F.Supp. 1388.
See also, 725 F.Supp. 162.

---

William Grady, Gen. Counsel, for Intern. Brotherhood of Teamsters.

Mudge Rose Guthrie Alexander & Ferdon (Audrey Strauss and Jed Rakoff, of counsel), New York City, for Intern. Broth. of Teamsters.

Frederick B. Lacey and Stuart Alderoty, Newark, N.J., for Independent Administrator.

Charles Carberry and Paul D. Kelly, New York City, for Investigations Officer.

Michael Holland and Barbara Hillman, Chicago, Ill., for Election Officer.

Lipsitz, Green, Fahringer, Roll, Schuller & James (William Feigenbaum, Buffalo, N.Y., and Gerald Chappman, of counsel), for Harold Friedman.

Law Offices of Moses Krislov Co., Moses Krislov, Cleveland, Ohio, for Anthony Hughes.

## MEMORANDUM & ORDER

EDELSTEIN, District Judge:

Plaintiff United States of America ("the Government") instituted this suit on June 28, 1988, which ultimately sought to rid the defendants, the International Brotherhood of Teamsters ("the IBT"), of the influence of organized crime. This opinion addresses issues raised in the implementation of a voluntary settlement signed on March 14, 1989, ("the Consent Decree") signed by the Government and most defendants named in the June 28, 1988 complaint. The Consent Decree called for the appointment of three Officials, the Independent Administrator, the Election Officer, and the Investigations Officer, ("the Court Officers") who would oversee the IBT's 1991 election for International Officers and file charges against those IBT members accused of corruption pursuant to procedures set forth in the Consent Decree.

The parties were brought together for a hearing on October 13, 1989 ("the hearing") to settle numerous disputes that have arisen in the course of bringing to life the goals embodied in the Consent Decree. This opinion supplements oral rulings made after the hearing to resolve these conflicts

Benito Romano, U.S. Atty., S.D.N.Y. (Randy M. Mastro and Richard Mark, Asst. U.S. Attys., of counsel), New York City, for U.S.

so that the Court Officers may discharge their duties.

The parties have brought the following matters before this Court, and they will be addressed in the listed sequence. First, Application II by the Independent Administrator and the Cross–Application filed by the IBT. Second, the Application by the Election Officer Michael Holland to be paid for services rendered. Third, the request by the Government to create a $100,000 fund to provide a pool for general operating revenue.

The fourth matter, Application III by the Independent Administrator will be considered with the motions for a preliminary injunction filed by Messrs. Friedman and Hughes in a opinion filed separately from these rulings. Further, the parties have settled the issues in Application IV by the Independent Administrator—to determine the proper salary for a lawyer on the Investigations Officer's staff—since the hearing.

*1. Application II by the Independent Administrator*

On September 29, 1989 the Independent Administrator submitted Application II to the Court requesting an interpretation of paragraph 12(D) of the Consent Decree. This interpretation will further determine the scope of the duties of the Election Officer. The Consent Decree provides in relevant part that "the Election Officer shall supervise the IBT election ..."

In his Application the Independent Administrator has asked for rulings on the following issues:

a. Delineation of the scope of the duties of the Election Officer;

b. Approval of the Draft Timetable and Election Officer Activities;

c. Distribution of the Election Survey;

d. The Election Officer's staffing requests.

At 8:30 a.m. on October 12, 1989, the IBT submitted papers including Opposition and a Cross–Application to Application II. The IBT asked this Court to accept the Cross–Application as pursuant to paragraph 16 of the Consent Decree, and as responsive to Application II of the Independent Administrator.

Summarily, in their Cross–Application the IBT asks this Court to interpret the Consent Decree with respect to the duties of the Election Officer and prevent him from engaging in any activity other than;

a. Monitoring the 1991 election for International Officers and any prior special elections to fill those vacancies;

b. "Supervising" the 1991 election by (1) distributing material to the IBT membership, (2) overseeing the ballot process, and (3) certifying the election results;

c. Engaging in any activities which affect the IBT constitution or the constitution or by-laws of IBT affiliates.

Further, the IBT refuses to pay for any activity of the Election Officer done in furtherance of goals that it regards as *ultra vires*. To this end the IBT opposes the fee and expense application of the Election Officer.

As a preliminary matter I find the IBT's Cross–Application improperly submitted according to the procedure set forth in the Consent Decree. The Court granted the IBT leave to file responsive papers. The papers submitted, while termed "In Opposition and a Cross–Application," are in substance and fact full Applications which should be filed according to the procedures set forth in the Consent Decree.

The IBT contends this Cross–Application was filed in accordance with paragraph 16 of the Consent Decree, which grants this Court jurisdiction over disputes and gives parties the right to file Applications for this Court's review. Paragraph 12(I) of the Consent Decree is the only statement of the procedure for filing an Application. The IBT ignored the procedures spelled out in paragraph 12(I), which requires the Administrator to give notice before making an application. The IBT assumes that Applications made by parties need not conform to the minimal procedures required of the Administrator.

As a matter of interpretation of the logic of the Consent Decree, I order that all Applications to this Court must conform

with this basic procedure as provided for in paragraph 12(I), including notice to the Court. In this instance, however, since the IBT has submitted detailed papers the consideration of which will decide the issues going to the very core of the Consent Decree, this ruling will include consideration of the IBT's Cross–Application.

### a. Scope of Election Officer's Duties

■ The seminal issue in these disputes concerns the scope of the duties of the Election Officer. The definition of his duties revolves around the interpretation of two crucial phrases in one sentence in paragraph 12(D)(ix) of the Consent Decree: "The Election Officer (1) shall supervise (2) the IBT election ... to be conducted in 1991."

In order to determine the scope of duties of the Election Officer, the Court must first interpret the meaning of the word "supervise" as used in paragraph 12(D) of the Consent Decree.

The Independent Administrator, Election Officer, and the Government understand the term "supervise" to involve an active and broad mandate to intervene in, and coordinate, the IBT electoral process up to and including the next general convention. The Election Officer seeks to promulgate electoral rules and procedures, educate IBT locals on the new process, monitor candidate campaigning, devise absentee voting procedures, and certify all elections. As authority, the Court Officers and the Government define "supervise" as a term of art used in labor law, and point to numerous cases interpreting the parallel language of the Labor Management Reporting and Disclosure Act, the LMRA or Landrum–Griffith Act.[1] In those instances, Courts regularly grant overseers broad authority to act under the rubric of "supervising" elections.

The IBT views the term "supervise" in a more passive framework, urging the Court to interpret the meaning of "supervise" as requiring the Election Officer to oversee the IBT electoral process, and provide post-election advice to locals only when sought. The IBT opposes the Election Officer's proposed proactive steps.

In addition, the IBT fiercely opposes using the term "supervise" as a term of art, and instead seeks to interpose a literal and restrictive definition. The IBT urges the Court not to interpret "supervise" outside of the exact language of the Consent Decree.[2]

This first problem involves the meaning of the term "supervise." The IBT envisions the election supervision as passive or advisory. Even a modest definition found in Webster's Third New International Dictionary defines "supervise" as follows: to coordinate, direct, and inspect continuously and at first hand the accomplishment of; oversee with the powers of direction and decision the implementation of one's own or another's intentions. The dictionary definition is supportive of a more expansive interpretation.

Further, I am persuaded that the parties intended the term "supervise" as written here to represent a term of art. "Supervise," as used in this portion of the Consent Decree, should incorporate the connotations connected to its use in the labor law field.

In addition to this definition of "supervise," I find that the specific language of paragraph 12(D), taken together with spirit and intent of the Consent Decree, requires that the term "supervise" be interpreted in its most expansive and proactive meaning.

The second phrase to be interpreted involves the definition of the term "1991 election." The Court Officers and the

---

1. See, e.g., Donovan v. Illinois Educational Association, 667 F.2d 638 (7th Cir.1982); Hodgson v. Chain Service and Soda Fountain Employees, 355 F.Supp. 180 (S.D.N.Y.1973).

2. The IBT cites the cases of Securities and Exchange Commission v. Levine, 881 F.2d 1165, 1178–79 (2d Cir.1989); and United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) for the proposition that Consent Decrees must be interpreted according to their writings. At oral argument, the Government adopted this view, and all parties agree that the Court need only look to the plain language of the Consent Decree to interpret its meaning.

Government understand that the term "1991 election" includes not only the actual vote at the convention by delegates for International Officers, but the entire electoral process that culminates in that particular set of votes.

The Court Officers and the Government contend that for the Election Officer to properly supervise the IBT election, he must have authority over the entire electoral process leading up to the IBT convention. The Government points out that pages 15–16, the previous two pages of the Consent Decree, detail the electoral process leading up to the 1991 convention election, and that this term obviously incorporates the entire electoral process up to and including the 1991 election of International Officers.

The IBT contends that the phrase "1991 election" as used in the sentence in question refers only to the 1991 convention election for International Officers. As support they again argue that Consent Decrees must be literally interpreted as written, and point out that this sentence as written mentions the 1991 elect*ion* in the singular, and not elect*ions* in the plural, obviously referring only to this one election.

Second, the IBT argues that the intention of the parties, as evidenced by the negotiation process that led to the Consent Decree, was for the Election Officer to have this limited role. The IBT submitted lengthy affidavits containing drafts of the emerging Consent Decree in support of this contention.

I find that the term "1991 election" as written in paragraph 12(D) was intended to encompass the entire electoral process which will culminate in the 1991 election for International Officers. The parties to the Consent Decree intended for the Election Officer to oversee every prelude leading up to and including the final election for International Officers.[3]

Such an interpretation is reached by following the IBT's argument that the Consent Decree must be interpreted according to its terms. This interpretation lies wholly within the confines of the Consent Decree as evidenced by its writings, and its intent and spirit. The IBT's request for an evidentiary hearing to further explore these issues is hereby denied.

To this end, I approve the proposed actions of the Elections Officer, including the right to promulgate electoral rules and procedures for the IBT nomination and election, to conduct an educational program aimed at the IBT membership, to actively supervise, direct, and oversee the campaigning of candidates, to institute absentee voting procedures, and certify all elections. The Election Officer shall have the authority to carry out these actions over any and all facets of the IBT electoral process up to and including the 1991 election for International Officers.

Further, I find that it is within the scope of the duties of the Election Officer to take any further reasonable actions necessary to carry out his duties as the Election Officer and ensure fair elections for the IBT membership.

b. The Draft Timetable of Election Officer Activities

■ The Election Officer has submitted a proposed timetable that provides the implementation schedule for conducting a local union survey, promulgating rules, meeting with individual locals to conform the local's electoral rules to the general rules, the supervision of candidate electioneering, a post-election challenge procedure, and the distribution of educational information about the election.

I approve the timetable as set forth by the Election Officer. The Consent Decree runs for a period of three years. During

---

**3.** The Government, in a sworn *amicus* letter presented to the Court on October 12, denied the IBT's assertion—as presented in the affidavits that accompanied their Cross–Application—that the parties never intended the phrase "1991 election" to encompass the entire electoral process. Mr. Mastro, who signed the Government's *amicus* letter and conducted the negotiations on behalf of the Government, insists that the Government and IBT negotiators were clear on the expansive meaning of this phrase, agreeing that "1991 election" should encompass the entire electoral process.

that time, meaningful reforms to the IBT electoral process are to occur. The only way for such changes to be realized is for the Election Officer to follow a strict schedule for implementing changes. To proceed without a timetable would encourage further delay and entrench opposition, all while expending the short time period of the Consent Decree.

Further, since I have found that all of the actions the Election Officer proposes to take listed on the timetable—with the exception of the election survey which we will turn to shortly—are permitted, I see no reason why any further delay should be necessary.

c. Distribution of the Election Survey

■ The Election Officer proposes to distribute a survey on local election practices and rules to obtain election related information. The Election Officer is empowered to take reasonable steps to obtain information necessary to carry out his duties. Both the Election Officer and IBT agree a survey is the cheapest and most efficient means available to obtain this electoral information. This particular dispute takes root over the unwillingness of the IBT leadership, specifically the IBT General President Mr. McCarthy or IBT General Counsel Mr. Grady to urge IBT locals to cooperate with the survey.

The IBT contends that the International Union has no authority to order its locals to respond to any survey—that such a step is beyond the bounds of the IBT Constitution. Further, the International Union is reluctant to compel its locals to take such action, and that locals should decide such issues for themselves.

In keeping with the specified power of the Court Officers to obtain information as provided for in paragraph 12(C), the acknowledged efficiency and necessity of gathering data on local information practices, and the spirit and intent of the Consent Decree, I hereby request the IBT—through General President McCarthy or General Counsel Grady—to issue a written directive requesting IBT locals to comply with the survey. I further find that the survey

process should be undertaken commensurate with the timetable established by the Election Officer in the proposed timetable.

d. Election Officer's Staffing Requests

■ The Election Officer has further asked permission to hire three support staff, a consultant, and a public relations firm to assist him in his duties. The Election Officer proposes to hire one Executive Assistant at $81,000 per year plus benefits, one Administrative Assistant at $39,000 plus benefits, and one secretary to be paid in the range of $26,000 to $32,000 per year, plus benefits. In addition, the Election Officer proposes to retain a professional labor economics consultant at the rate of $75 per hour, and a public relations firm.

The Election Officer claims need for the personnel based on the size and scope of his appointed task. He reminds the court of the 1.7 million voting members of the IBT, which, according to the Election Officer, is larger than the voting population of 26 states. The consultant will assist the Election Officer in preparing a database program and algorithm to compile data on the 660 IBT locals. The public relations firm would help with the task of gaining the confidence and compliance of the locals.

The IBT opposes both the staffing requests and the hiring of outside consultants. Their opposition is based on the belief that the Election Officer's duties do not involve the local elections in the fall of 1990, but only the 1991 convention election. The IBT views the Election Officer's staffing requests as arming him for an unwarranted, and exceedingly expensive intrusion into the IBT electoral process.

I have examined the specific personnel requests and the resumes of the individuals the Election Officer proposes to hire that were included in his Affidavit attached to Application II.

I hereby grant all of the Election Officer's personnel requests. While I am mindful of the need to contain costs and not allow the Court Officers free reign to spend without oversight, the herculean size and scope of the Election Officer's duties

require adequate staffing. He has requested two full-time staff whom I find qualified for the positions. In addition, I am sympathetic to the data processing and organizational needs of the Election Officer: He must coordinate and monitor over 660 different elections. To accomplish this task, he needs command of the actual situation he confronts.

In addition, I endorse the Election Officer's request to obtain the services of a public relations firm should he find it necessary. I am aware of the positions the Union leaders have taken with regard to the Consent Decree and Court Officers in letters to their membership. Given the IBT's own official stance on this Consent Decree as evinced by the opinions in the official IBT Magazine, public relations help for the Election Officer is necessary.

### 2. Election Officer Application for Fees and Expenses

On September 28, 1989, I received an application from the Elections Officer for payment of fees and reimbursement of expenses for his work on IBT related matters during the period May 30, 1989 to August 31, 1989. The Election Officer requests compensation in the amount of $33,637.50, and reimbursement for expenses in the amount of $4,484.27. Contesting the Election Officer's submission, the IBT balks at paying for services and expenses incurred performing activities it feels are outside the scope of his duties.

I have reviewed the detailed accounting submitted of the fee requests made by the Election Officer for himself and Ms. Barbara Hillman and Mr. Daniel Koen, who assisted him, and the expenses they incurred. I find the request for fees and expenses reasonable and appropriate, and order the IBT to remit the amount of $38,121.77 to the Election Officer.

### 3. The $100,000 Fund

The Government first submitted a settlement order on September 26, 1989 to create a proposed $100,000 general operating fund for the purpose of making ready monies available for the three designated Court Officers, the Administrator, Mr. Lacey, the Investigations Officer, Mr. Carberry, and the Elections Officer, Mr. Holland. The Government would supply the initial $100,000 amount for the fund, with the Court Officers supplying monthly accountings to the Government. The Court Officers would ultimately seek reimbursement from the IBT.

The IBT vigorously opposed the creation of the $100,000 fund and launched a caustic exchange of letters between the Government and the Union in the weeks preceding the hearing. The Investigations Officer has written in support of the Government's efforts, and the Independent Administrator indicated his backing of this application as well.

The Government cites as support for the creation of the fund the Court's power under Rule 8 of the Local Rules for the Southern and Eastern Districts of New York, and its power under the RICO statute, 18 U.S.C. § 1962(b).

The IBT's opposition to the creation of the fund may be summarized as follows:

1. That no provision for the fund was made in the Consent Decree; To grant the order would an impermissible unilateral amendment by the Government;

2. That this Court lacks jurisdiction to create this fund since, as a result of the Consent Decree, there is no RICO action "pending final determination" under § 1962(b);

3. The Government improperly invokes Local Rule 8;

4. It will upset the incentive for the Court Officers to work directly and cooperatively with the IBT;

5. The fund is unnecessary since the IBT has fully cooperated with all funding requests made by the Court Officers.

The parties initial positions were reinforced by a week-long exchange of lengthy letters stridently advocating each side's position on the matter.

As a threshold matter, I find that the IBT's jurisdictional arguments lack merit and must be dismissed. I endorse the

IBT's outside Counsel's suggestion that this question may be solved without reaching the ongoing RICO dispute question. This Court has jurisdiction over the Consent Decree, which explicitly vests this Court with continuing and exclusive jurisdiction over matters that arise in this case.

I find that this relief does not fall outside the construction of the Consent Decree. The creation of the fund makes no substantive changes in the IBT's rights and liabilities, but rather alters some funding mechanisms. The IBT's right to object to expenses is preserved, and if the Court finds the Court Officers used the fund for any frivolous expenditures, the Government would ultimately be liable. In addition to the language of the decree, the spirit and intent of the Decree allows this fund.

The IBT arguments are weakened here since they have accepted financial help from the Government in the past, including temporary office space and office furniture for the Court Officers, costs that under the Consent Decree should clearly have been borne by the IBT. Applying the IBT's current arguments, such help would also fall outside the explicit language of the Consent Decree. I find the fund will foster dialogue and cooperation between the parties.

I hereby find that the proposed settlement order creating the $100,000 fund, dated September 26, 1989, is proper and order that it be carried out.

Despite the IBT's admonitions to the contrary, it appears that funding for the Court Officers remains a major issue diverting the Officer's attentions. The IBT maintains that it pays whatever bills the Officers submit pending scrutiny to protect the funds of the IBT membership. While the Court lauds the interest of the IBT in saving their membership money, I find the IBT's current pattern of behavior unacceptable.

To streamline the funding process, I order the following revision in reimbursement procedure, agreed to by the parties. Each of the Court Officers will submit their quarterly expense and fee applications to the IBT and the Court simultaneously. The IBT shall then have three business days to submit their objections to the expenses to the Court. I will examine the submissions and objections and rule on them promptly. Staff members will continue to be paid monthly without any change in procedure.

Application IV by the Independent Administrator

The parties have submitted a stipulated settlement on this matter, arriving at a compromise on the salary and benefits of Mr. Gaffey. I endorse this settlement.

### 4. Application III by the Independent Administrator

The Independent Administrator has requested that I rule on his jurisdiction to pursue charges against Mr. Harold Friedman and Mr. Anthony Hughes, whom he ruled against in an opinion dated September 29, 1989.

In response, Friedman and Hughes jointly and separately have made a motion to this Court pursuant to Rule 65 seeking injunctive relief barring the Administrator from hearing the charges brought by the Investigations Officer against them. Their injunction seeks to have this Court enjoin Mr. Lacey from conducting the hearing, or in the alternative, order that they not be collaterally estopped from raising factual issues decided in their criminal conviction in *U.S. v. Friedman*, 86 Cr. 114, in the Northern District of Ohio. I will rule on Application III, and Friedman and Hughes' motion for a preliminary injunction in a separate opinion.

### Conclusion

This opinion settles a large number of matters relating to the Consent Decree entered into between the United States of America and the International Brotherhood of Teamsters and others, the IBT. The explicit and implicit purpose of the Consent Decree is to rid the union of the hideous cloud of corruption that envelops it.

After six months of these skirmishes I would now like to firmly establish that the parties must not only adhere by the letter of the Consent Decree, but must abide by

its spirit as well. The spirit and intention of this Consent Decree command that its specific language be given the most reasonable possible interpretation. For this Consent Decree to continue to be viable and meaningful, the Court Officers must not be hampered in the performance of their obligatory duties. Finally, I would strongly encourage the parties to compromise and settle disputes in the spirit and intent of a voluntary decree whenever possible.

SO ORDERED.