**UNITED STATES of America, Plaintiffs,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.**

**No. 88 Civ. 4486(DNE).**

United States District Court, S.D. New York.

Dec. 18, 1997.

---

Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano (Theodore M. Lieverman, of counsel), Haddonfield, NJ, for Election Officer, Barbara Zack Quindel.

London & Mead (Christopher B. Mead, of counsel), Washington, DC, for Jere B. Nash III.

Mary Jo White, U.S. Atty., S.D. New York (Karen B. Konigsberg, Asst. U.S. Atty., of counsel), New York City, for Plaintiff U.S.

Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P. (Edward J.M. Little, of counsel), New York City, for Defendant Intern. Broth. of Teamsters.

Goldman & Hafetz (Frederick P. Hafetz, of counsel), New York City, for Cohen, Weiss & Simon.

*OPINION & ORDER*

EDELSTEIN, District Judge.

*Background*

This opinion emanates from the voluntary settlement of an action commenced by the United States of America against, *inter alia,* the International Brotherhood of Teamsters ("IBT" or "the union") and the IBT's General Executive Board. The settlement is embodied in the voluntary consent order entered March 14, 1989 ("Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime. The long history of this case has been set forth in this Court's numerous prior opinions. Accordingly, only those facts necessary for resolving the instant motion shall be set forth.

Among other reforms, the Consent Decree restructured the IBT's electoral system to provide for direct, secret-ballot, rank-and-file election of the union's top officers. The Consent Decree contains the IBT defendants' agreement that "there should be no criminal element or La Cosa Nostra corruption of any part of the IBT," and that "it is imperative that the IBT ... be maintained democratically, with integrity and for the sole benefit of its members and without unlawful outside influence." Consent Decree, Fifth & Sixth Whereas Clauses. The Consent Decree permanently enjoins General Executive Board members, officers, representatives, members and employees of the IBT from, *inter alia,* committing any acts of racketeering activity and obstructing or otherwise interfering with the work of the Court-appointed officers or the Independent Review Board." *Id.* at ¶ 10.

Pursuant to the Consent Decree, the IBT's first-ever direct, rank-and-file election was held in 1991 under supervision of an independent Court-appointed Election Officer, at IBT expense. The Consent Decree gave the Government the option to have the 1996 IBT election supervised by the Election Officer, at Government expense. Consent Decree ¶ 12(D)(ix). Paragraph 12(D)(ix) of the Consent Decree provides in pertinent part:

The union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT elections. The

union defendants further consent to the U.S. Department of Labor supervising any IBT elections or special elections to be conducted after 1991 for the office of the IBT General President, IBT General Secretary–Treasurer, IBT Vice President, and IBT Trustee.

On February 7, 1995, this Court approved a stipulation between the IBT and the Government in which the parties reaffirmed their agreement to have the Court-appointed Election Officer supervise the 1996 IBT elections. *United States v. International Bhd. Of Teamsters,* 88 Civ. 4486 (S.D.N.Y. Feb. 7, 1995) (the "February 1995 Order"); The February 1995 Order requires the IBT to provide the Election Officer with suitable office space and to indemnify the Election Officer and Election Appeals Master, but otherwise provides that the Government would fund the Election Officer and the Election Appeals Master if the Government elected to have the election supervised. *See* February 1995 Order ¶¶ 1,5.

The 1996 Election took place and the ballot count concluded on February 27, 1997. *See* Declaration of Barbara Zack Quindel, dated August 21, 1997 ("Quindel Decl.") at ¶ 4. As the count proceeded, the Election Officer announced the winning candidates for various offices. Following the announcements, post-election protests were filed. *Id.* at ¶ 4. The Election Officer conducted an investigation of the post-election protests and uncovered serious violations of the 1996 Election Rules.[1]

On August 21, 1997, the Election Officer granted certain post-election protests, finding that violations of the 1996 Election Rules "may have affected the outcome of the election." *Id.* at ¶ 5. The Election Officer found

that "the contributions [to TCFU] were the product of employer solicitations and/or employer-created schemes to inject employer and IBT funds into the Carey Campaign, as well as to induce individuals to contribute through the improper manipulation of IBT spending." *Cheatem,* Post–27–EOH (BZQ) (Aug. 21, 1997) (Rerun Decision) at 96. Furthermore, the Election Officer stated that "[t]hese were egregious violations by high level campaign functionaries who believed winning at all costs was more important than abiding by the [1996 Election Rules] and the law." *Id.* at 114. Based on these findings, and pursuant to her authority under the Consent Decree and the 1996 Election Rules, the Election Officer refused to certify the results of the 1996 Election and ordered a rerun election for all positions except for Central Region Vice Presidents and the President of Teamsters Canada. *Id.,* at 114–15.

On November 17, 1997 the Court-appointed Election Officer for the sole purpose of deciding the issue of disqualification of Ron Carey, Honorable Kenneth Conboy, found that the IBT General President and the union's Director of Governmental Affairs, acting in their official capacities, authorized the use of $735,000 in IBT funds for improper purposes in violation of the Court-ordered Election Rules. *See Cheatem,* Post–27–EOH (KC) (Nov. 17, 1997) (Carey Disqualification Decision) at 65, 69. Honorable Kenneth Conboy thus decided to disqualify Ron Carey from running as a candidate in the rerun election. *Id.* At 74.[2]

Also on November 17, 1997, the Election Appeals Master reversed the Election Officer's decision not to investigate alleged im-

---

1. The Consent Decree prohibits any contribution "or other things of value" to a candidate from an employer. Consent Decree ¶ 8 (amending Article IV, Section 2 of the IBT Constitution). The ban on employer contributions "reflects a desire to minimize the danger that employers will influence the outcome of union elections." *United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707 (1982). Article XII, of the 1996 Election Rules also prohibits an employer from contributing, and a candidate from accepting, anything of value "where the purpose, object or foreseeable effect ... is to influence, positively or negatively,

the election of a candidate." 1996 Election Rules, Article XII, Section 1(b)(1). Furthermore, the 1996 Election Rules and the Labor Management Reporting and Disclosure Act ("LMRDA") prohibit labor unions from making any contributions to a candidate. 1996 Election Rules, Article XII, Section 1(b)(1) & Article XIII, Section 1; 29 U.S.C. § 481(g).

2. Election Officer Conboy's decision regarding the disqualification of Ron Carey is on appeal to this Court.

proprieties possibly involving the Hoffa slate. *See In re Carey Slate,* 97 Elec.App. 322(KC) (Nov. 17, 1997).

### Statement of the Case

On December 1, 1997, the Interim Election Officer, Benetta M. Mansfield, submitted an application to this Court for an order securing funding for the rerun election. Election Officer Application XIII, for an Order Securing Funding for the Rerun Election, Dec. 1, 1997 ("Application XIII"). In her application, Interim Election Officer Mansfield estimated that an additional $7.4 million would be required to finance the rerun election. *See* Declaration of Benetta Mansfield in Support of Election Officer Application No. XIII dated December 1, 1997 ("Mansfield Decl.") ¶ 19. The question presently before this Court is whether the Government or the IBT should bear the cost of the rerun election.

### I. Funding of the 1996 Election Supervision

The Election Officer budgeted approximately $21.2 million over four fiscal years for the 1996 election. This amount represents roughly the same cost borne by the IBT for the supervision of the 1991 election. *See* Memorandum of Law in Support of Election Officer Application XIII ("EO Br.") at 2. The Department of Justice disbursed $322,953 for election supervision in Fiscal Year 1994; $1,708,407 in Fiscal Year 1995; and $6 million in Fiscal Year 1996.[3] *See* EO Br. at 2–3. Additionally, the Department of Labor expended $5.6 million in Fiscal Year 1996 and $3.8 million in Fiscal Year 1997 for election supervision, through reprogramming authorized by Congress. As of September 30, 1997, the end of the last fiscal quarter, the cost for the election supervision totaled approximately $17.5 million. *See* EO Br. at 4; Mansfield Decl. ¶ 6.

### II. Fiscal Year 1997 Funding

The Omnibus Consolidated Appropriations Act of 1997 (Pub.L. No. 104–208) (the "1997 Act") appropriated $1.9 million to the Justice Department for Election Officer supervision. *See* Mansfield Decl. ¶ 5(d). Additionally, the accompanying Conference Report authorized the Attorney General to reprogram or transfer an additional $1.9 million for this purpose from funds provided to the Department, subject to the reprogramming requirements and transfer authority. However, the statement of Managers in the Conference Report indicated that "[t]he conferees agree that this is the final payment for this purpose." H.Rep. No. 104–863 (July 1996); Declaration of Karen Konigsberg in Support of Government's Response to Election Officer's Application No. XIII, dated December 10, 1997 ("Konigsberg Decl.") at Exh. A.

With respect to the appropriated funds, the 1997 Act provides "[t]hat $1,900,000 for supervision of the [IBT] national election shall remain available until expended." *Id.* Although these funds have been earmarked by the Department for the supervision of the IBT election, much of this money remains unspent. *See* Konigsberg Decl. ¶ 7. The Government acknowledges that approximately $900,000 of this $1.9 million will remain unspent after all of the non-rerun costs of the 1996 election are tallied. *See id.* This includes the resolution, through appeal, of the Election Officer's investigations into protests filed in connection with the 1996 election. *See id.*

As for the authority to transfer or reprogram funds under the 1997 Act, the Statement of Managers in the Conference Report to the 1997 Act states that the Attorney General may "provide an additional $1,900,000 for IBT election supervision from funds provided to the Department of Justice, subject to either the reprogramming requirements in section 605 of this Act[4] or the

---

**3.** The United States Attorney's Office for the Southern District of New York also provided $45,883 for this purpose in Fiscal Year 1993 out of its litigation budget. EO's Br. at 3.

**4.** Section 605(a) provides in pertinent part that "[n]one of the funds provided under this act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997 ... shall be available for obligation or expenditure through a reprogramming of funds which ... (3) increases funds or personnel by Any means for any project or activity for which funds have been denied or restricted ... unless the appropriations Committee of both Houses of Congress are notified fifteen days in advance of

transfer authorities in section 107 of this Act."[5] H.R.Rep. No. 104–863. In order to comply with the reprogramming and transfer requirements, the Department must provide 15 days notice to the House and Senate Appropriations Committees prior to undertaking a transfer or reprogramming.

Although the Department notified Congress of its intentions to transfer funds, the Department, in deference to the Appropriators who objected to the transfer, has not spent any funds through reprogramming or transfer under the 1997 Act on the supervision of the rerun. *See* Konigsberg Decl. ¶ 9. The Government claims that the authority to reprogram or transfer funds for IBT election supervision lapsed at the end of Fiscal Year 1997. *See* Government's Response to Election Officer Application No. XIII For an Order Securing Funding For the Rerun Election ("Government Br") at 7 (citing Pub.L. No. 104–208 § 107).

## III. *Fiscal Year 1998 Funds*

"The 1998 appropriations Acts for both the Department of Justice and the Department of Labor contain an explicit prohibition on the use of Fiscal Year 1998 monies for purposes of the IBT election supervision." Government Br. at 8. The 1998 Department of Justice Appropriations Act (the "1998 Act"), states: "[n]one of the funds made available in this Act may be used to pay the expense of an election officer appointed by a court to oversee an election of any officer or trustee for the [IBT]."[6] Pub.L. No. 105–119 § 619; Konigsberg Decl. Exh. B. Regarding the Department of Justice's reprogramming authority, Section 605(a) of the 1998 Act provides the Department with the same reprogramming authority it had in 1997. *See* Konigsberg Decl. Exh. D. Indeed, the language in

Section 605 of the 1998 Act is identical to the language of Section 605(a) of the 1997 Act (*See supra* n. 4) with the exception that 1998 is substituted for 1997. *See* Konigsberg Decl. Exh. D.

IBT argues that the Fiscal Year 1998 appropriations do not preclude the United States from fulfilling its obligation under the Consent Decree because Congress did not completely bar Government funding of the IBT election in these appropriations laws. International Brotherhood of Teamsters' Memorandum In Response to Election Officer Application No. XIII For an Order Securing Funding for the Rerun Election, ("IBT Br.") at 11, 15–16. Indeed, the IBT asserts, that the appropriations are not "blanket prohibitions" and only apply to the current fiscal year. Id. Therefore, the IBT contends that the unspent $3.8 million appropriated in Fiscal Year 1997 is available for the rerun election.[7] *Id.* at 12. Additionally, the IBT suggests that monies from prior fiscal years could be allocated for election supervision. IBT Br. at 12.

The Government suggests that the debates in the House and Senate on prohibiting the use of Fiscal Year 1998 appropriated funds for the 1996 rerun election, as well as other statements in the public record, reflect a widespread consensus among Members of Congress that the rerun should be supervised. *See* Konigsberg Dec. ¶ 11. However, as stated, many Members of Congress have clearly expressed the view that the union should bear the cost of that supervision. *See* Konigsberg Dec. Exhs. E & F.

## IV. *Attempts to Secure Funding for the Rerun*

The Government contends that they have looked to four sources for funding of the

---

such reprogramming of funds." Pub.L. No. 104–208 § 605.

**5.** Section 107, providing transfer authority between appropriations, requires compliance with the procedures set forth in Section 605 (*see supra* n. 4) for the transfer to be effective. Pub.L. No. 104–208 § 107.

**6.** The 1998 Department of Labor Appropriations Act contains the exact same language. *See* Pub.L. No. 105–78 § 518; Konigsberg Decl. Exh. C.

**7.** As noted, the sum of the $3.8 million is comprised of two separate accounts of $1.9 million each. The IBT contends that the first is already in the Election Officer's Account and the second, appropriated in the Omnibus Consolidated Appropriations Act of 1997 for this purpose, remains under the control of the Department of Justice. *See* IBT Br. at 12 (citing Mansfield Decl. ¶ 11).

rerun. First, the Government secured from this Court the authority to establish an escrow account, the funds from which are to be used to help defray the costs of a rerun election. *See United States v. IBT*, 88 Civ. 4486 (S.D.N.Y. Sept. 12 1997). A total of $920,00 was deposited in the escrow account and provided to the Election Officer from restitution payments of the three criminal defendants who pled guilty to involvement in channeling IBT funds through various organizations to benefit the Carey campaign. *See* Konigsberg Decl. ¶ 12. An Additional $500,000 was recently deposited in the escrow account and made available to the Election Officer for the settlement of the liabilities of the November Group, Inc. *See United States v. IBT*, 88 Civ. 4486 (S.D.N.Y. Dec. 12, 1997).

Second, the Government asserts that the Department sought to use amounts remaining from the $3.8 million appropriated or authorized in the 1997 Act for supervision of the IBT election. *See* Konigsberg Decl. ¶ 14. Subsequent to the issuance of the August 21, 1997 decision refusing to certify the 1996 IBT election and ordering a rerun, staff for the House and Senate Appropriations Subcommittees with jurisdiction over the Justice Department's appropriations informed the Department that the Election Officer was not to spend federal appropriations on the 1996 rerun election. *See id.* at ¶ 15. Thereafter, the Government asserts, the Department briefed Members of Congress and the Appropriations staff as to the importance of the supervision as a law enforcement initiative. *See* Konigsberg Decl. Exhs. G, H, I. The Department then requested the Appropriators' consent to use the balance remaining of the $3.8 million appropriated or authorized in Fiscal Year 1997 for election supervision. *See id.*

"On September 25, 1997, the Department formally notified the Chairmen of the House and Senate Subcommittees on Departments of Commerce, Justice, State, the Judiciary and Related Agencies of the Committee on Appropriations of an intended transfer of $1.9 million for purposes of supervising the rerun of the 1996 IBT election, pursuant to Section 107 of the 1997 Act." Government Br. at 10–11 (citing Konigsberg Decl. ¶ 16). According to the Government, the letter also notified the Appropriators of the Department's intention to use the funds remaining from the $1.9 million appropriated in Fiscal Year 1997 for purposes of supervising the rerun. *See* Konigsberg Dec. Exh. J. These two amounts (the remainder of the $1.9 million authorized and the $1.9 million appropriated) represented the balance of the $21.2 million originally budgeted and authorized by Congress for the 1996 IBT election supervision.[8] *See* Konigsberg Dec. ¶ 16. The Appropriators, opposing Government funding of the rerun, refused to clear the Department's proposal. *See id.* The Government claims that the Department, out of deference to Congress did not allocate these monies. Government Br. at 19.

For its part, the IBT notes that the opinion opposing Government funding was made by a committee staff member. The IBT states that it "is at a loss to understand how 'committee staff' can alter the terms of the Consent Decree or accomplish what Congress did not vote to do." IBT Br. at 13. The IBT claims that since the funds had already been lawfully appropriated, the subsequent views of "appropriate Congressional committee staff" are irrelevant. *Id.* At 13.

Third, the Government insists that the Department opposed the legislation in Congress prohibiting the use of Fiscal Year 1998 funds for supervision of the IBT election, in case Fiscal Year 1998 funds were needed to pay for the election supervision. *See id.*

Fourth, the Government asserts that the Department sought an agreement with the IBT in an attempt to help resolve some of the funding issues of the rerun. *See id.* The Government states that it, and the IBT, negotiated sharing the costs of the rerun. *See* Konigsberg Dec. ¶ 17. Under a proposed arrangement, if the "supervisory" costs of the rerun could be paid out of amounts remaining from Fiscal Year 1997 monies and from the funds placed in the escrow account, the "conduct costs" of the election would be sustained by the IBT. The parties allegedly

---

**8.** As noted, Congress had authorized these funds for supervision, either through direct appropriations or authorizations to reprogram or transfer existing funds. *See* Konigsberg Dec. ¶ 16.

agreed that the "conduct costs" totaled no less than $3,940,000, of which the IBT advanced $200,000 to the Election Officer. Government Br. at 11–12. However, the agreement never materialized because the Department was unable to obtain Congressional consent regarding the Fiscal Year 1997 funds and would not expend such funds in absence of such consent. *See id.* Due to the circumstances surrounding the 1996 IBT Election, the Government urges this Court to order the IBT to bear the costs of the rerun election.

In response, the IBT argues that despite what Congress has done, the Government must still pay for the rerun election. The IBT claims that it "entered into the Consent Decree with 'the United States,' not with a branch of government; the underlying suit was brought and settled in the name of 'the United States,' and the Court's decree runs to and binds 'the United States.'" IBT Br. at 2. Therefore, the IBT contends that it is the legislative and executive branches obligation, and not the obligation of this Court or the IBT, to find a resolution of their differences so that they can provide funding for the rerun election. *Id.* The IBT thus requests that this Court enter an order directing the United States to provide the necessary funding for the rerun. *Id.*

The IBT counters the Government's suggestion that the IBT pay the cost of the rerun by asserting that this cannot be squared with the Consent Decree. *Id.* at 3. They argue that the Consent Decree does not require supervision over the 1996 election but clearly provides that if the United States opts to supervise the 1996 election, they must do so at their own expense. *Id.* at 4 (citing Consent Decree ¶ 12(D)(ix)). Moreover, the IBT contends that there is no legal authority to permit a later transfer of financial obligations from the United States to the IBT. IBT Br. at 3. Indeed, the IBT states that "[t]he Consent Decree cannot be interpreted to accommodate such a radical revision of the bargain made by the parties, particularly because the financial obligation of the United

States arises here only because of a choice the United States has made." *Id.*

### Discussion

### The Importance of Supervision of the Rerun

Before addressing the arguments set forth by the parties, it must be noted that the goals of the Consent Decree are to rid the IBT of the hideous influence of organized crime and to instill in the IBT an enduring democratic tradition. There is a general consensus among the parties that in order to achieve these goals, supervision of the 1996 rerun election is imperative.

As repeated *ad nauseam* in almost every IBT-related opinion of this Court, prior to the entry of the Consent Decree, the IBT was plagued with corruption and the influences of organized crime. Indeed, in the decades prior to the entry of the Consent Decree, the Government, at a cost of tens of millions of dollars, obtained convictions against approximately 340 individuals in more than 200 prosecutions involving IBT-related corruption without wresting control of the union from organized crime forces. Government Br. at 12.

Additionally, prior to the implementation of the Consent Decree, the IBT was devoid of democratic traditions. The union's election procedures gave effective control to the members of the GEB and a handful of local union leaders which enabled La Cosa Nostra to dictate the selection of IBT General Presidents and other officers by controlling only a select few individuals. *See* Konigsberg Decl. at ¶ 21.

Despite the problems of entrenched corruption and a lack of democratic tradition, the Consent Decree has been successful in producing significant reforms in the IBT. *Id.* ¶ 22. Through the actions of the Independent Review Board and the disciplinary officers who proceeded it, organized crime, while not completely eradicated, has been reduced significantly.[9] The Consent Decree mechanisms have been, and continue to be, instrumental to achieving the goal of eliminating

---

**9.** Over 390 corrupt union officials have been sanctioned or removed, many for associating

with organized crime. Government Br. at 13.

corruption and the influences of organized crime from the IBT.[10] *See* Konigsberg Decl. ¶ 22.

In addition, the Consent Decree's electoral reforms made possible the first democratic, rank-and-file election in the union's history in 1991, and the second in 1996. There is general agreement that these two rank-and-file elections involved extraordinary participation by union members for a union election. *See* Government Br. at 14 (citations omitted). In particular, the 1996 election was characterized by unprecedented membership interest and unparalleled intensity. *See In re: Cheatem,* Post–27–EOH (BZQ) (August 21, 1997) (Rerun Decision) at 113–14. The Consent Decree is responsible for enabling this culture of democracy to emerge within the union. *See id.; see also* Association of Union Democracy letter submission as *amicus curie* in response to Election Officer Application X, dated September 18, 1997, at 1 (stating that "the nascent growth of democracy in the IBT is the Consent Decree's greatest achievement").

The Government has stated that it has long understood that only a continued effort would accomplish the long-standing objective of ridding the IBT of corruption and the infiltration of organized crime. Government Br. at 16. The Government contends though that "while great progress has been made, continued vigilance, and in particular, comprehensive supervision of the 1996 rerun election, is critical [to keeping with this objective.]" *Id.*

In sum, the parties agree that in order to best further the goals of the Consent Decree, it is crucial to ensure that the rerun is the result of a fair, free, democratic and informed election; untainted by corruption, intimidation or organized crime. They further agree, especially in wake of the misconduct that tainted the 1996 election, that compre-

hensive supervision by the Election Officer is essential to achieve that result.

*The Status of the Rerun Election*

■ As a preliminary matter, this Court must determine whether the rerun election is a continuation of the 1996 IBT election. Paragraph 12(D)(ix) of the Consent Decree clearly states that "[t]he union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT elections." Consent Decree ¶ 12(D)(ix). Both the Government and the IBT consider the rerun election to be part of the 1996 election.[11] *See,* Government Br. at 19 (stating that "the [Justice] Department has informed the [Congressional] Appropriators of its view that the rerun was expressly provided for as a remedy in the 1996 Election Rules, and that because the 1996 election has not been certified, the rerun cannot be viewed legally as a new or separate election"); IBT Br. at 6–8. As this Court noted with regard to the 1991 IBT elections, "the term '1991 election' ... was intended to encompass the entire electoral process which will culminate in the 1991 election for International Officers. The parties to the Consent Decree intended for the Election Officer to oversee every prelude leading up to and including the final election for International Officers." *United States v. International Bhd. of Teamsters,* 723 F.Supp. 203, 207 (S.D.N.Y.1989). The same interpretation may be applied to the term '1996 IBT election' as written in paragraph 12(D)(ix) of the Consent Decree. Therefore, this Court agrees with both parties that the rerun of the 1996 election is necessarily part of a continuation of the 1996 IBT election.

*Funding the Rerun Election*

■ Now this Court turns to the important issue of providing funding for the rerun election. As the IBT notes in its papers,

---

**10.** Indeed, the discovery of the misconduct in the 1996 election was due to the disclosure and other procedures provided for under the Consent Decree's comprehensive election supervision. The Consent Decree mechanisms also led to the rerun of the election and the disqualification of the IBT General President to remedy that misconduct. *See In re: Cheatem,* Post–27–EOH (BZQ) (Aug. 21, 1997) (Rerun Decision); *In re:*

*Cheatem,* Post–27–EOH (KC) (Nov. 17, 1997) (Carey Disqualification Decision).

**11.** Congressional Appropriations staff have informed the Justice Department that the Appropriators view the rerun as a new election, as opposed to a continuation of the 1996 election. *See* Konigsberg Decl. at ¶ 17.

Attorney General Janet Reno sent a letter dated October 3, 1997 to relevant subcommittee Chairmen and Ranking Minority Members. Declaration of Lisa A. Cahill In Support of International Brotherhood of Teamsters' Memorandum In Response to Election Officer Application No. XIII For an Order Securing Funding for the Rerun Election, ("Cahill Decl.") at ¶ 6, Exh. A. In one such letter, addressed to Congressman John Edward Porter, Attorney General Janet Reno wrote:

> [a]s the Congressional debate on the Nickles and Hoekstra amendments indicates, there is a widespread agreement that continued supervision of the IBT election is important. The disagreement seems to be about who should pay for it. As a legal matter, however, the answer to that question is clear: under the Consent Decree that the government and the union entered into in 1989, the union consented to monitoring of the 1996 election only if the government pays for it. And ... there is no question that any rerun of the IBT election will still be part of the 1996 election. Thus, the government must be willing to pay for supervision to ensure that it occurs.

Letter from Janet Reno, United States Attorney General, to Congressman John Edward Porter, Chairman, Subcommittee on Labor, Health & Human Services and Education (Oct. 3, 1997); *see* Cahill Decl. at ¶ 6, Exhibit A. Nevertheless, the Government requests that this Court enter an order requiring "the IBT to bear the costs of the rerun" election. Government Br. at 28.

The Government argues that this "Court's inherent authority and considerable discretion to enter reasonable orders designed to ensure compliance with a consent decree" permits this Court to order the IBT to bear the cost of the rerun election. *Id.* at 26 (citing *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995); *Equal Employment Opportunity Comm'n v. Local 580*, 925 F.2d 588, 593 (2d Cir.1991); *Berger v. Heckler*, 771 F.2d 1556, 1568–69 (2d Cir.1985); *Picon v. Morris*, 933 F.2d 660, 662 (8th Cir.1991); *United States v. District Council of New York City and Vi-*

*cinity of the United Brotherhood of Carpenters and Joiners of America, et al.*, 972 F.Supp. 756, 762 (S.D.N.Y.1997). As noted in the Government's papers, the Court-appointed Election Officer Kenneth Conboy "found that the IBT General President and the union's Director of Governmental Affairs, acting in their official capacities, authorized the use of $735,000 in IBT funds for improper purposes in violation of the court-ordered Election Rules. Government Br. at 22 (citing *Cheatem*, Post–27–EOH (KC) (Nov. 17, 1997) (Carey Disqualification Decision) at 65, 69). In addition, Election Officer Kenneth Conboy found that other union officers and employees, who, although were not found to have had knowledge of the illicit schemes, failed to prevent these contributions even though they noted the amounts were extraordinary and questioned their propriety. Government Br. at 22.

The Government asserts that these actions, "which are attributable to the union, interfered with the Consent Decree's mandate and the right of the [IBT] membership and the Government to a fair, free, democratic and informed IBT election." *Id.* Therefore, the Government claims, that where "a party to a consent decree has taken actions that have undermined and interfered with the relief ordered by the decree, it is within the Court's equitable discretion to issue a remedial order to ensure that the purposes of the decree will be fulfilled." *Id.* The Government notes in its papers, "[a] consent decree 'is an order of the court and thus, by its very nature, vests the court with equitable discretion to enforce the obligations imposed on the parties.'" Government Br. at 26 (quoting *Local 359*, 55 F.3d at 69). Indeed, a consent decree imposes on a court "an affirmative duty to protect the integrity of its decree." *Berger*, 771 F.2d at 1568.

In his November 17, 1997 opinion disqualifying Ron Carey from running as a candidate in the rerun election, Election Officer Conboy found that "a leadership official, here the highest in the Union, has abused his official power to the direct and significant injury of the electoral process." *Cheatem*, Post–27–EOH (KC) (Nov. 17, 1997) (Carey Disqualification Decision) at 65. Election

Officer Conboy found that Carey's misuse of union power, by authorizing the expenditure of $735,000 in IBT general treasury funds to help his campaign, constituted "classic self-dealing" and a breach of fiduciary duty to the membership—"one of the core types of misconduct the Consent Decree was designed to eliminate." *Id.* at 69, 71. He further noted that "courts have analogized the use of union office or power for personal profit to a species of racketeering." *Id.* at 69. Although Election Officer Conboy's decision disqualifying Carey from the rerun election is on appeal to this Court, his findings are entitled to great deference, *United States v. IBT ("Friedman & Hughes")*, 905 F.2d 610, 616 (2d Cir.1990), and, unless or until they are overturned by this Court, provide a sufficient factual basis for this Court to take action. *See Juan F. v. Weicker*, 37 F.3d 874, 879–80 (2d Cir.1994), *cert. denied*, 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995).

In addition, the findings of Election Officer Barbara Zack Quindel in her decision ordering a rerun, findings that have not been challenged, provide further support for the Government's argument that the union should be required to bear the costs of the rerun election. Election Officer Quindel found that the IBT made donations to various advocacy groups as part of an improper swap scheme to benefit the Carey Campaign, that "significant amounts of IBT funds were used to benefit the Carey Campaign," and that in the course of a one-week period IBT employees approved $735,000 in contributions which formed the basis for the swap scheme. *Cheatem*, Post–27–EOH (BZQ) (Aug. 21, 1997) (Rerun Decision) at 101.

"Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." *Berger*, 771 F.2d at 1569; *accord Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir.1983), *cert. denied*, 464 U.S. 874, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983). The misconduct by the IBT frustrated the goals of the Consent Decree and directly led to the need for a rerun election. Where the "performance of one party threatens to frustrate the purposes of the decree," *Berger*, 771 F.2d

1556, 1568, the Court need not enter a finding of civil contempt in order to grant remedial relief. Nor is this Court limited to the provisions of the Consent Decree when fashioning an order to ensure full compliance with its previous orders. "The court has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed to by the parties. Unlike a private agreement, a consent judgment contemplates juridical interests apart from those of the litigants." *Local 580*, 925 F.2d at 593; *see also Weicker*, 37 F.3d at 878 (stating that "in implementing the purposes of a decree, a court is not rigidly confined only to the terms contained within the four corners of the parties' agreement"), *cert. denied*, 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995).

To ensure that the Consent Decree's goals were achieved, the Government chose to exercise its right under the Consent Decree to have the 1996 IBT election supervised by an Election Officer at Government expense. Although it is clearly in the public interest to have the rerun election supervised, the Consent Decree does not impose a legal duty on the Government to continue indefinitely to have the 1996 election process supervised at the Government's expense. Both the IBT and the Government agree, however, that Election Officer supervision is imperative for the rerun election. *See,* Government Br. at 24; IBT Br. at 8. The Government has already expended over $17.5 million on the 1996 IBT Election in order to achieve the goals of the Consent Decree. Because additional costs must now be incurred due to the actions taken by persons affiliated with and acting for the IBT, it is equitable to require that the IBT bear the additional costs caused by its own conduct. Therefore, while it is unfortunate that the members of the IBT must bear the additional costs because of the conduct of their officials, the membership of the IBT benefit significantly from the effort in this litigation to rid the union of corruption and organized crime, and to bring democracy to the union.

Although the IBT must bear the additional cost of the rerun election, this Court established an escrow account to be used to help defray the costs of a rerun election. *See*

*United States v. International Bhd. Of Teamsters,* 88 Civ. 4486 (S.D.N.Y. Sept. 12, 1997). A total of $920,000 from restitution payments of the three criminal defendants who pled guilty to involvement in channeling IBT funds through various organizations for the benefit of the Carey campaign, will be available to fund supervision of the rerun. In addition to the aforementioned funds, pursuant to an agreement entered into between the November Group, Inc. and the Government, an additional $500,000 has been deposited in the escrow account for the settlement of the liabilities of the November Group, Inc. Konigsberg Decl. at ¶ 13. Pursuant to this Court's order of December 12, 1997 these funds are also available to the Election Officer. *United States v. International Brotherhood of Teamsters,* 88 Civ. 4486 (S.D.N.Y. Dec. 12, 1997).

### Conclusion

The time has come when the IBT must bear its own costs for cleansing its Augean stable. In plainer words they made the mess. It is their job to clean it up at any price. It would be perverse to characterize this as a fine or penalty. The IBT is merely being called upon to pay the price for undoing the harm they caused.

Much has been said about the Consent Decree and much has not been said at all. The Consent Decree is not self executing, was entered into voluntarily on the eve of its pending trial. From the very beginning IBT was less than cooperative. Before the ink was hardly dry the Consent Decree was put into play and became a battle front. Resistance to almost every provision of the Decree became the order of the day. Its spawned mega-litigation at enormous costs. Every effort was made to emasculate the Decree and to make it a nullity. This Court's resources were strained to the limit. Hearings and more hearings took place. Opinions and more opinions had to be written and eventually appeals, more than 125 in number, were necessary to deal with the constant barrage of attacks on the Decree.

The root of all evils in this union was corruption without surcease. In this universe of the absurd it is an unfortunate fact of life that knaves, criminals, and persons of dubious character take center stage and evil overshadows all that is good. Hard working honest teamsters are overborne, browbeaten and bludgeoned and are ill famed by their corrupt colleagues. Thus they are also unfortunately seen as defilers of decency. This cannot, must not, and will not be tolerated. Cleansing this union will continue to require the strongest, most unified, concentrated, concerned effort.[12] Perpetual vigilance and heroic effort is the cost of democracy. Listen to Albert Camus, "A taste for truth at any cost is a passion which spares nothing."

It should be noted in the closing of this opinion that Jere Nash, Martin Davis, and Michael Ansara the unholy Trinty generally pleaded guilty to the abuse, misuse and manipulation of union funds.

Therefore, in order to prevent interference with the Consent Decree's mandate of a fair, free, democratic and informed IBT election, and to ensure that the Consent Decree's goals are fulfilled, the funding for the rerun election must come from the IBT, to the extent that other sources, (such as the escrow account established for the payment of restitution monies, and any other funds that may subsequently become available), are not sufficient to pay the costs of Election Officer supervision.

SO ORDERED.

---

12. It should be noted that Kenneth C. Crowe, the renowned author of the book *Collision* stated "without [Honorable David N. Edelstein] the Teamster reform would have been lost in a quagmire."